**M. G. INMAN, Sr., et al., Appellants,**

**v.**

**Ruth I. PARR et al., Appellees.**

**No. 6136.**

Court of Civil Appeals of Texas.

Beaumont.

Feb. 13, 1958.

Rehearing Denied March 26, 1958.

King, Sharfstein & Rienstra, Beaumont, for appellants.

W. G. Walley, Raymond T. R. Tatum, Beaumont, for appellees.

R. L. MURRAY, Chief Justice.

This is an appeal from a judgment in the district court of Jefferson County in favor of Ruth I. Parr, a feme sole, Grace I. Booth and husband, Edwin Booth, appellees, against M. G. Inman, Sr., and M. G. Inman, Jr., appellants. Ruth I. Parr brought suit against M. G. Inman, Sr., M. G. Inman, Jr., and Grace I. Booth and husband, Edwin Booth, to cancel and set aside as to all parties certain instruments executed by the parties, and in the alternative to recover damages from M. G. Inman, Sr., and M. G. Inman, Jr., for fraud. The instruments related to the sale and transfer to M. G. Inman, Sr., and M. G. Inman, Jr., by Ruth I. Parr and Grace I. Booth, of all their interest in Inman Chevrolet Company of Port Arthur.

The appellants, Inman, Sr., and Inman, Jr., answered by special exception, general denial, special denials and brought cross actions against Ruth I. Parr and Grace and Edwin Booth, praying for judgment of specific performance of the sales agreements and contracts sought by Ruth I. Parr to be cancelled, and in the alternative for damages for breach of such agreements on the part of appellees Parr and Booth. Mrs. Booth sought judgment only denying to appellants specific performance or damages, and quieting title in her of her remaining interest in said business.

The case was tried to a jury and upon the jury's verdict the trial court rendered judgment against M. G. Inman, Sr., and M. G. Inman, Jr., and in favor of appellee Ruth I. Parr for the sum of $115,000 and in favor of Grace I. Booth and husband, Ed-

win Booth, quieting title in Mrs. Booth to her interest in the Inman Chevrolet Company.

The appellants filed motions for instructed verdict, for judgment non obstante veredicto, and to disregard special issue findings of the jury. They also filed motion for new trial and amended motion for new trial. Such motions for instructed verdict, for judgment non obstante veredicto and to disregard special issue findings and amended motion for new trial were overruled by the trial court and the appellants have duly perfected their appeal to this court for review of the judgment.

At the time of his death in December, 1946, Philip Inman was the owner of Inman Chevrolet Company in Port Arthur, Texas. He had been such owner and was the Chevrolet dealer in Port Arthur for over twenty years prior to his death. He died intestate, his survivors and heirs at law being his widow, Irene Inman, and brother, M. G. Inman, Sr., and his sisters, Ruth I. Parr and Grace I. Booth. M. G. Inman, Sr., was the owner and operator of the Chevrolet Agency in Orange, Texas, and he immediately after Philip Inman's death took control of and continued the operation of the Inman Chevrolet Company in Port Arthur. This was done with the consent of all the other heirs. He was appointed temporary administrator of his brother's estate and later such appointment was made permanent. On January 5, 1947, the heirs of Philip Inman entered into a written agreement by which certain designated realty and personal property was to be given to the widow, Irene Inman, and the remainder of the property of the estate of Philip Inman, deceased, was apportioned among the brother and the two sisters. On May 3, 1947 the widow, Irene Inman, and brother, M. G. Inman, Sr., and sisters Ruth I. Parr and Grace I. Booth and her husband, Edwin Booth, executed a second agreement by which they divided and agreed to divide among themselves as heirs the property of Philip Inman, deceased. By this second agreement the widow was paid

over $126,000 in cash and given U. S. Government bonds of maturity value of $24,000, a $30,000 note secured by a lien upon certain real estate in the city of Port Arthur, various tracts of real property, and most of the personal property in the home of Philip Inman, deceased. All of such property she accepted as a complete distribution and delivery to her of her interest in the separate and community property of her deceased husband. The other parties received as their share of the property of their deceased brother, all the remainder of his property, which included the Inman Chevrolet Company. Such three parties, the brother and the two sisters, by such agreement also obligated themselves to pay all debts of Philip Inman, deceased, including federal and state taxes, inheritance taxes due the State of Texas, income taxes, all ad valorem taxes and all costs of the administration of the estate. Included in the property received by the brother and two sisters was the Inman Chevrolet Company and the real property in the 800 block of Procter Street in Port Arthur where such business was conducted. The agreement itself was made contingent upon the acquisition by M. G. Inman, Sr., of a new selling agreement or franchise from the Chevrolet Division of General Motors Corporation in order that the sale of Chevrolet automobiles by the business might be continued by the brother and two sisters. M. G. Inman, Sr. did secure such a franchise.

Inman, Sr. operated the business of Inman Chevrolet Company under appointment as administrator of Philip Inman's estate until December 31, 1950. Shortly before the death of Philip Inman the buildings and place of business of Inman Chevrolet Company were practically destroyed by fire and the business was carried on from temporary headquarters at a filling station. During the time of M. G. Inman, Sr.'s operation of the business as administrator, the obligations to Irene Inman, the widow, were discharged. This was largely done out of money in possession of Philip Inman at the time of his death. The profits from the op-

eration of Inman Chevrolet Company were also used for this purpose. Such profits also made possible the building of a new plant for the sale and servicing of Chevrolet automobiles at the former place of business of Inman Chevrolet Company, the land being owned jointly by the brother and two sisters.

During the time of M. G. Inman, Sr.'s operation of the business as administrator the net profits therefrom were in excess of one million dollars. One-third of this amount was received by each of three owners, M. G. Inman, Sr., Ruth I. Parr and Grace I. Booth. A portion of such profits of each of the three persons was paid to build the new building where the business was operated and such real property is owned by all three such parties.

During the years of the operation of such business by M. G. Inman, Sr., as administrator, M. G. Inman at various times discussed with his sisters his intention not to continue the operation of the Inman Chevrolet Company under its existing organization. He was the only one who took an active interest in the business, the two sisters being inexperienced in business affairs and having no knowledge which would be of benefit to the operation of such business. He informed them that he would not continue operating the business for them, as he said, because the Chevrolet Sales Executive in Texas objected to a Chevrolet sales agency partly owned by persons who were inactive in the business itself. He told them that he did not propose to do all the work of operating the business and receive only one-third of the profits. Correspondence from a Chevrolet Motors head to Mr. Inman was in evidence, showing that that company was interested in having in a sales agency, and particularly in this one, only persons who were active in the administration of the business.

The administration of the estate of Philip Inman, deceased, was closed on December 31, 1950, and M. G. Inman's final account as administrator was approved. Mr. In-

man continued to operate the business as managing partner without any written agreement of partnership until December 26, 1951. On this date, December 26, 1951, Ruth I. Parr, Grace I. Booth and her husband executed various written agreements to sell to M. G. Inman, Sr. and M. G. Inman, Jr., their interest in and to the business of the Inman Chevrolet Company and also entered into a lease agreement by which M. G. Inman, Sr., Ruth I. Parr and Grace I. Booth, as owners of the real property on which the Chevrolet business was conducted, were to be paid rentals based upon the net income of the company.

These instruments are the subject of the attack of the appellees in this lawsuit.

The selling agreement or franchise from Chevrolet Motors Division-General Motors Corporation, dated November 1, 1951, recited that it was between said Chevrolet Motors Division, called seller, and "Inman Chevrolet Company and/or copartnership of Port Arthur, Jefferson County, Texas," called dealer. This agreement also recited in part, as follows:

"Third: This is a personal contract, being entered into in reliance upon and in consideration of the personal qualifications of and representations with respect thereto of M. G. Inman, the dealer, * * * who actively and substantially participates in the ownership and/or operation of the dealership. The individual or individuals designated shall be responsible for any act or omission of any of dealer's agents or employees which may be contrary to the purposes and objectives of this agreement for the obligations of dealer hereunder. Dealer shall not transfer nor assign this agreement or any right or obligation hereunder nor make nor suffer to be made any change in the ownership, financial interests or active management of dealer without the prior written approval of seller."

The following instruments were executed by the parties on December 26, 1951:

1. Bill of sale and option, to be effective as of January 1, 1951, executed by Ruth Parr selling an undivided 8⅓% interest in Inman Chevrolet Company to M. G. Inman, Jr., and giving him an option to purchase from her at any time after December 31, 1951, an additional 1⅔% interest.

2. A similar bill of sale and option executed by Grace Booth and husband, Edwin Booth, to M. G. Inman, Jr.

3. Bill of sale and option to be effective January 1, 1951, executed by Ruth Parr and giving to M. G. Inman, Sr. the option to purchase from her at any time after December 31, 1951, a 3⅓% interest in Inman Chevrolet Company, and giving him the additional option to purchase from her at any time after December 31, 1952, an undivided 20% interest in said business.

4. A like option executed by Grace Booth and husband to M. G. Inman, Sr.

5. A partnership agreement dated January 1, 1951, between M. G. Inman, Sr., M. G. Inman, Jr., Ruth Parr and Grace Booth by virtue of which the assets of said business are owned by the parties in the proportion of 33⅓% to M. G. Inman, Sr.; 16⅔% to M. G. Inman, Jr.; 25% to Ruth Parr and 25% to Grace Booth, said partnership to end on December 31, 1957, and specifically referring to the option agreements whereby Ruth Parr and Grace Booth would eventually part with all interest in Inman Chevrolet Company.

6. A lease agreement dated December 26, 1951, but to be effective as of January 1, 1952, whereby Inman, Sr., Ruth Parr and Grace Booth, as lessors, leased to the partnership of Inman Chevrolet Company the buildings and land occupied by Inman Chevrolet Company.

The preliminaries leading to the execution of the above instruments are the subject of voluminous testimony in the record. We summarize portions thereof, and quote portions thereof, as follows:

Beginning in March of 1951, shortly after termination of the administration of the estate of Philip Inman, deceased, and after the approval of his final account as administrator, M. G. Inman, Sr. maintained his negotiations with Mrs. Parr and Mrs. Booth to secure the sale to him of a portion of their interest in the business of Inman Chevrolet Company and to grant him options to purchase the remainder of such interests in the future. He pointed out to them that the sales franchise from the Chevrolet Division of General Motors Corporation was a year to year contract which could be terminated by the Chevrolet Division at the end of the current year; that the contract was made and continued on the basis of his individual management of the business as dealer, and that unless they sold to him he would cancel or would not renew the dealership at the end of 1951. He further represented to them that the business was worth $75,000, since they were selling only their interest in the physical assets of the business; that the share of each was of the value of $25,000. During all such time and prior thereto M. G. Inman, Sr., as the manager of the business, made and was required to make to the Chevrolet Division of General Motors Corporation a detailed monthly report, showing the net profits and net worth of the business for the current year. Such reports showed that for the year 1951 through March 31st, the net profit was $94,490.32 and the net worth was $194,304.96; that to November 30, 1951 the net profit amounted to $221,167.05 and the net worth was $310,981.69.

During the pendency of the litigation the trial court appointed an auditor to make an audit of the various accounts of the Inman Chevrolet Company and the report of such auditor shows that of date of December 26, 1951, the date when the instruments under attack were executed, the net worth of the business was $265,317.72 and that of such amount $155,774.96 was in cash on hand or in banks. M. G. Inman, Sr. did not disclose to appellees what the profits and

net worth of the business were during the year 1951 while negotiations were in progress.

Mrs. Booth and Mrs. Parr had copies of the audit report of the business for the year ending December 31, 1950, which report shows profits for the year 1950 to be $280,000 and the net worth of the business $304,000. In January of 1951 both Mrs. Parr and Mrs. Booth each received a check for $85,000 as their share of the profits of the business for 1950. During the years of M. G. Inman's operation of the business Mrs. Parr and Mrs. Booth received out of the profits checks as follows: for 1947—$40,000, 1948—$61,250, 1949—$50,000.

Mrs. Parr testified as follows in regard to the preliminaries of their execution of the instruments under attack in this case:

"Q. Mrs. Parr, when did Mr. M. G. Inman, Sr. first say anything to you about parting with your interest in your brother's estate in the Inman Chevrolet Company, do you recall? A. After he received the franchise, about a week or so later we were standing on—in front of the building, the Chervrolet building on the corner, he and his wife and his son and I, and he said—

"Q. That is his son, M. G. Inman, Jr.,— A. Yes.

"Q. —who is a party to this suit? A. Yes.

"Q. What was said at that time? A. Well, he said, 'Ruth, I want you to sign over your part of the business—' (I thought he meant the business and the building) to Major, Jr. (and Major was quite a little boy at time) I patted him on the back (I thought he meant to leave it to him when I died, not give it to him now), and I said, 'I don't know of anyone I had rather give it to,' (leave it to, rather).

"Q. Did that end the conversation? A. That is as far as I know. It went in one ear and out the other. I did not think anything about it.

"Q. When is the next time that you remember when you and M. G. Inman, Sr., discussed your parting with your interest in the Inman Chevrolet Company? A. I think it was Christmas or New Year's Eve, or New Year's or during the holiday season—I don't know which it was. My sister and I were at his home and he asked us to go to his office.

"Q. That was somewhere in the neighborhood of 1949, was it not? A. In Orange; Chevrolet business in Orange, late in the evening, around eleven o'clock at night, and he said he wanted us to sign an option to let him have our part of the business. Then he said, 'Oh, say, for five thousand dollars or so,' and I didn't pay attention to what he was saying because I thought it was so silly I didn't even listen to him very much.

"Q. There were no negotiations further? A. His excuse was that he did not want to be bothered with my sister's husband. He kept saying he didn't want to have any complications with them. And I said, 'I don't have anyone else' and he says, 'I want to do for one what I want to do for the other.'

"Q. That was somewhere around 1949, as you recall? A. I don't know whether it was '48 or '49.

"Q. I presume it was one of those years? A. Yes, sir.

"Q. That is all there was to that? A. That is all there was to that except it continued after that, but it was always one excuse after the other. First, it was Edwin, he did not want to be bothered with Edwin in the event something happened to Grace.

"Q. Did he ever make any concrete proposal after that time as to what he would pay you for the— A. No.

"Q. Or anything like that? A. That is it.

"Q. But he did eventually want your interest in the business? A. That is it.

"Q. I direct your attention to the 31st of December, 1950. As of that date, I believe the administration was closed out, is that correct? A. I don't know whether it was closed—

"Q. I direct your attention to sometime the latter part of March or early part of April, 1951, did you and your brother and your sister have any conversation with regard to the sale of your property at that time? A. That is when I heard or knew or learned that he had ceased to be an administrator, he had finished with that. I don't know.

"Q. How did you know he had ceased to be? A. He called me and said he wanted to bring Mr. Graham Bruce up to my apartment, he wanted my sister there. He came up one afternoon with Mr. Bruce, Graham Bruce.

"Q. Did they bring a paper along with them? A. They brought a paper, and, as usual, I did not read it, I signed where he told me to sign it, to release him as administrator, then he pulled out another paper and asked me to sign that, and I said, 'What is this paper for?' He said, 'That is a lease on the building, and an option I want you to sign.' And I said, 'I don't know what that is, I want to read it,' and Mr. Bruce said, 'If my brother had done for me what your brother had done for you, I would sign anything he asked me to without reading it,' but I didn't sign that one. * * *

"Q. Now, you say at the time you signed that instrument you did not read it, Mrs. Parr? A. I did not.

"Q. But Mr. Bruce and Mr. Inman, your brother, explained to you that that was closing out the estate as of the 1st of January, 1951? A. Well, I didn't understand it was the first of January, but it was the closing of the estate, he had been released as administrator.

"Q. You say they had another instrument there that they explained was an option? A. It was a lease also.

"Q. It was a lease and option, is that correct? A. I don't know what it was. I didn't read it.

"Q. And did you execute that instrument at that time? A. No.

"Q. Did they tell you what they wanted —what the effect of that instrument was, what they wanted you to do by executing that instrument? A. It has been so long, it is hard for me to remember, but it was my impression—I didn't read the paper.

"Q. At that time, did Mr. M. G. Inman, Sr. seek to acquire your interest in that partnership or not? A. Yes.

"Q. Did he tell you what he was going to pay for it? A. I don't remember whether or not he said at that time.

"Q. Did he tell you what the value of it was at that time? A. No.

"Q. Did he tell you how much profits had been made since the first of January, 1951, at that time? A. No.

"Q. All right; when did you next discuss parting with your interest in the Inman Chevrolet Company with M. G. Inman, Sr.? A. I don't know just exactly when, but later that summer, along in that time, I don't remember the exact date.

"Q. Was that sometime along in July, you think? A. Possibly, or just in the summer, I don't remember, not any specific time that I remember.

"Q. From time to time from then on until December 26, 1951, did you have conversations with your brother, M. G. Inman, Sr., relating to the execution of these instruments you finally signed? A. Not relating to those instruments, no.

"Q. About selling your interest? A. At times when I would see him, he would bring it up, he would ask me when, etc., that I would do it.

"Q. During those times, did he ever tell you what the profits of the business were? A. He didn't ever tell me.

"Q. During that period of time from the time you signed this administrator's release here which has been read to the jury, until December 26, 1951, did you—did or not your brother ever furnish to you the monthly reports of the Inman Chevrolet Company, that he furnished to the General Motors? A. He did not.

"Q. Did he ever talk with you about—did he ever tell you during that time whether or not the Inman Chevrolet Company's assets were of any particular value? A. He told me they were only twenty-five—it was only worth twenty-five thousand dollars, because there was nothing there mostly but nuts and bolts.

"Q. And did he say what it was worth as a going concern? A. No. He just told me that.

"Q. And did he tell you at any time anything about what he wanted you to sell your interest, you and your sister to sell your interest in this so badly? A. Well, because the Chevrolet people wanted him to do so, the main reason.

"Q. Did he tell you what would happen if you didn't do it, with respect to Inman Chevrolet Company? A. He told us he did not want to lose the franchise, they wanted him to do it, he wanted us out, we would have to sign that in order to—

"Q. In order to keep the franchise? A. Yes, to keep the franchise. I made a mistake, I told you that was twenty-five thousand, I mean that was from each one of us.

"Q. Seventy-five thousand dollars in all? A. Yes.

"Q. Did you believe it was worth seventy-five thousand dollars? A. Of course, He said so.

"Q. Did he state anything during these negotiations between the time you signed these administrators releases December 26, 1951 as to whether—what his intentions were with respect to the last twenty per cent? A. No, he— * * *

"Q. Mrs. Parr, during the negotiations that you have testified to that led up to the execution of these instruments, I will ask you to state whether or not your brother, M. G. Inman, ever made any representation to you as to whether he would ever completely put you out of that business? A. Yes, he did.

"Q. Will you tell the jury what that was, please? * * * A. On more than one occasion. A. I said on more than one occasion he said unless the Chevrolet people made him.

"Q. Will you state when he, to the best of your memory, he first made the representations? A. The very first time?

"Q. Yes, ma'am. A. Well I can tell you definite the first time that I remember.

"Q. All right, ma'am. A. Was about in October.

"Q. 1951? A. 1951.

"Q. All right, tell the jury? A. All right, he called and said he wanted to talk to my sister and me about an agreement as to an option because he said, he said he had to give the Chevrolet Motor Company some assurance that he would get the option, and so he asked if he could come to my apartment and would my sister be there, he wanted to talk to us, because it was time to renew the franchise and before he could renew it, he had to give them some assurance about an option, that we had come to an agreement as to an option. So he came up that afternoon, and we talked and talked, and he said—I didn't want to do it. He said, 'Well, I didn't say I would put you out.' He said, 'I have to show them that you are willing to do something, and I will —' I have to say it in effect the way I understood it, that I did not— 'I will not push you out unless they make me, and I don't think they will.' We didn't sign the paper and he didn't bring the paper, I don't remember the paper that day. The following Sunday he called again and he said he had a letter he wanted to show us, and when he came up there, there was a paper. He said

he had to send this in to the Chevrolet. Grace said, 'I thought it was a letter.' He said, 'Oh, no, it is just a little paper,' and he says, 'if you don't sign it, I am going down to the office and I will stay there until 9:00 o'clock and I will call Mr. Mingle in Dallas, and tell him I am not going to renew the franchise.' And so he left, and after awhile we decided to go on down there, and we said, 'All right, Major, we will sign this for you to show you we trust you.' And Grace handed him the paper. And she says, 'Now, Major, it looks like to me you have got us where you—you can put us out if you want to.' Says, 'Looks like to me you can put us out if you want to,' and he said, 'Who said I was going to put you out?' He said, 'I am not going to unless the Chevrolet people make me.' And he said, 'I don't think they will,' I think his expression he used, those are the specific things he mentioned that I remember.

"Q. Did he other times make the same representations? A. No, I—

"Q. Thereafter until the time of the execution of these instruments on December 26— A. I don't remember the specific times, and what time, those two, I do—two times, I do remember.

"Q. Now, Mrs. Parr, did you—I will hand you these two instruments and ask you if your signature appears on them? A. It is.

"Q. Does your signature appear on them? A. It does.

"Q. Can you tell this jury where you signed this instrument, if you recall? A. Well, if I signed it—I mean when *it* signed it, I must have signed it in Mr. Orgain's office, but I didn't read it.

"Q. Was that on December 26, 1951, the day after Christmas, 1951? A. I think it was that date.

"Q. And your signature likewise appears on each of these instruments? A. Yes.

"Q. Were those instruments signed by you at the same time that the other instru-

ment you have just identified were signed? A. Well, I presume so, but I didn't read it. I don't know.

"Q. The only instrument you have signed in connection with this transaction were signed in Mr. Orgain's office December 26, 1951? A. Yes.

"Q. Your answer to that was 'yes'? A. Yes. * * *

"Q. Now, Mrs. Parr, regardless of the date those instruments bear there, do you state to the jury that they were all executed at the same time? A. No. I am not sure.

"Q. I mean on the 26th day of December, 1951? A. No, I am not sure.

"Q. You don't know whether they were all executed on that date? A. I don't know.

"Q. You will note that they were dated back before the 1st of January, 1951? A. That is correct.

"Q. It is your testimony to this jury here that you did not sign them on January 1, 1951? A. I did not sign them until the 26th of December. * * *

"Q. Now, Mrs. Parr, I have here in my hand what counsel for Mr. Inman has provided me as financial statements of the Inman Chevrolet Company for the period from January 1, 1951 to February 28, 1951, and you will note there that this report shows that the profits of the year to date under total income and expenses was $60,-685.43. Were you ever during these negotiations shown that financial report? A. Never.

"Q. Did you know— A. I never saw it before.

"Q. Did you know at the time that the net profit and loss after income taxes of that business to the 28th of February, 1951, was $22,674.00? A. I did not.

"Q. I will likewise show you a financial statement of the Inman Chevrolet Company covering a period from January 1, nineteen hundred fifty—

"Q. (By Mr. Walley) Were you ever shown a copy of the financial statement that I now exhibit to you during these negotiations, this financial statement? (Indicating March 31, 1951 statement) A. Never.

"Q. Were you familiar, or were you given any information by your brother, M. G. Inman, Sr. as to the contents of that? A. No, not at all.

"Q. Did you know on March 31, 1951, that the net profits of that business up to that time amounted to $94,490.32? A. No, I did not.

"Q. Did you know, or were you informed of the information contained in this instrument up to March 31, 1951, that the net worth of that business was $184,304.96? A. No, sir. * * *

"Q. All right, now, Mrs. Parr, during the month of April the negotiations that led up to your execution in April, the negotiations which led up to the execution of these instruments on December 31, were going on, were they not? A. That is right.

"Q. I show you here a financial statement prepared by the Inman Chevrolet Company for the business up to the 30th day of April, 1951, shows a net worth of such business as of April 30, 1951 in the sum of $209,572.46, it shows a net profit of year to date up to April of 1951, in the end of April, of $114,757.82. I will ask you to state whether or not your brother, M. G. Inman, furnished you with a copy of this report or permitted you to inspect these reports during these negotiations? A. He did not.

"Q. Did he ever at any time tell you the information that you now see contained in this report? A. He did not.

"Q. At that time, at the end of April, these instruments had not been executed, had they, Mrs. Parr? A. No.

"Q. All right. I likewise show you a financial statement of the Inman Chevrolet Company for the period commencing January 1 of 1951, to the 31st day of May, 1951, showing that the total net worth of the Inman Chevrolet Company as of May 31, 1951, was $229,152.56, showing the net profit earned by that business up to that date was $134,337.92. Now, during—were these negotiations still going on at the end of May, 1951? A. They were more or less started.

"Q. All right. And up to that time, did your brother, M. G. Inman, Sr. ever furnish you with a copy of this financial statement? A. He did not.

"Q. And did he ever, at any time, inform you substantially what these figures in this statement substantially shows? A. No, he did not.

"Q. Now, I show you the financial statement of the Inman Chevrolet Company furnished by M. G. Inman, Sr. to the Chevrolet Motors Division of the General Motors Corporation covering the period from January 1, 1951 to June 30, 1951. Now, these instruments had not been executed at that time, had they? A. No.

"Q. This report shows that the total net worth of the Inman Chevrolet Company at that time was $243,240.79, that the business had earned net profits up to the end of June, 1951, the sum of $148,426.15? Did your brother at any time during the negotiations up to this time show you a copy of that financial statement? A. No, he did not, ever. * * *

"Q. Did he ever tell you substantially the figures, or that being the condition of the business? A. No.

"Q. Had the instruments that you signed on December 26, 1951 been signed on July 31, 1951? A. No.

"Q. The negotiations were still going on towards that, were they? A. Yes.

"Q. All right. And that financial statement shows that the net worth of the Inman Chevrolet was $248,722.55, and shows that the net profit up to that date of the Inman Chevrolet, that is up to July 31 of the

year 1951, was $153,907.91, were you ever furnished by your brother, M. G. Inman, Sr. during these negotiations with this financial statement? A. I never saw one before. * * *

"Q. Did he ever tell you during these negotiations substantially the figures that are contained in this financial statement you now see? A. No, he did not.

"Q. All right. I now show you such a financial statement covering a period from January 1, 1951 to 8/31/51 (which is August 31, 1951). These instruments that made the basis of this lawsuit to be set aside had not been signed at that time, had they? A. No.

"Q. This financial statement shows a total net worth of Inman Chevrolet Company as of the end of August, 1951, of $264,907.87, doesn't it? A. It does.

"Q. And the net profit that is made up to the end of August, 1951 are shown by this financial statement to amount to $170,-093.23, isn't that correct? A. It is. * * *

"Q. (By Mr. Walley) Now, during the negotiations that led up to the execution of these instruments, did your brother, M. G. Inman, Sr. ever furnish you with the information contained in this financial statement? A. No, he didn't.

"Q. And you have never seen this financial statement before this date? A. Never have.

"Q. Now, I show you a like financial statement for the period covering the period from January 1, 1951 to September 30, 1951, showing the condition of Inman Chevrolet Company for the year 1951 up to the date September 30, 1951. This financial statement shows the total net worth of that business at $279,229.68, does it not? A. It does.

"Q. And it shows that the net profits earned by that business from the first of January, 1951 up to the 30th of September, 1951, to amount to $189,415.04.

"Q. Now, Mrs. Parr, on the 30th of September, the negotiations for the execution of these instruments was still going on, is that correct? A. That is correct.

"Q. Were you ever furnished with either a copy of the financial statement or told by your brother and partner, M. G. Inman, Sr., what those figures were, substantially? A. I have not.

"Q. Now, Mrs. Parr, I show you a financial statement prepared by M. G. Inman on behalf of the Inman Chevrolet Company covering a period from January 1, 1951, to October 31, 1951, for the Inman Chevrolet Company of Port Arthur, Texas. It shows that the total net worth as at the end of October, 1951, was $298,882.62, does it not? A. It does.

"Q. And it likewise shows that the net profits made by that business during the year 1951 up to the last day of October was $209,067.98, does it not? A. It does.

"Q. Mrs. Parr, the negotiations for the execution of these instruments was still going on the last day of October, 1951, isn't that correct? A. That is correct.

"Q. Did your brother, at any time during those negotiations, ever furnish you with a copy of this financial statement? A. No, he didn't.

"Q. Did he ever tell you during the time substantially the figures that you now see on this financial statement? A. He did not discuss the figures.

"Q. I now show you financial statement of the Inman Chevrolet Company prepared by M. G. Inman, Sr. for the Chevrolet Motors Division of the General Motors Corporation covering period from January 1, 1951 to November 30, 1951, and that financial statement shows that the total net worth of that business on November 30, 1951 was $310,981.69, and that it had earned in profits during the year 1951 up to November 30, 1951, the sum of $221,167.05. The instruments that made the basis for cancellation in this suit had not at that time

been executed at that time, had they? A. No.

"Q. And you and Mr. Inman and your sister Grace were still negotiating for the execution of those instruments? A. That is right. * * *

"Q. $221,167.05 net profits for the year, is that correct? A. That is.

"Q. That is what this financial report shows? And the financial report shows that the net worth of the business is $310,-981.69, does it not? A. It does.

"Q. Now, Mrs. Parr, the negotiations that led to the execution of these instruments was still going on as of the date of that report, were they not? A. That is right.

"Q. Did your brother, M. G. Inman, Sr. ever show you a copy of that financial statement before you signed those instruments? A. He did not.

"Q. Did he ever tell you the contents of those instruments? A. He did not.

"Q. Did he ever give you substantially the figures quoted as being the value of that business? A. He did not.

"Q. Now, Mrs. Parr, I will ask you to state whether or not, when your brother told you that the total net worth of that Inman Chevrolet Company business was $75,000.00, did you rely upon that statement?—When your brother told you the net value of what you were selling there was $75,000.00, he told you there was a bunch of nuts and bolts down there, did you rely upon his statement? A. Implicitly. That is what he said, it was worth about $75,000.00, because it was mostly nuts and bolts.

"Q. Had you known that the total assets, net assets, of that business, were in the neighborhood of $300,000.00 instead of $75,000.00, would you have executed these instruments? A. Not hardly. * * *

"Q. Had you known that the books of the Inman Chevrolet Company reflected

that the net worth of that business was in excess of $300,000.00 on the last day of November, 1951, would you have, on December 26, 1951, signed these papers that you signed? A. I would not. * * *

"Q. (By Mr. Walley) Would you answer my question—I believe you answered the question. You would not have, is that correct? A. I would not have done so.

"Q. Now, Mrs. Parr, had you known on December 26, 1951, that on November 30, 1951 the books of the Inman Chevrolet Company showed a net profit of that business for that year of in excess of $200,000.-00, would you have signed these instruments dated back to the first of January, 1951? A. I would not have done so.

"Q. All right, ma'am; now, when Mr. Inman told you that unless you and your sister executed these agreements that the Chevrolet Motors Division of General Motors Corporation would cancel that franchise and that you would lose everything in this business, did you rely upon that statement or not? A. Certainly.

"Q. I will ask you to state whether or not when Mr. Inman told you on the occasion you have testified to that if you and your sister would execute these instruments that he had no intention of ever putting you completely out of the business unless Chevrolet Motors Division made him to, did you rely on what he said as his intention? A. I did. * * *

"Q. Now, Mrs. Parr, after you executed these instruments on December 26, 1951, Mr. Inman asked you to execute other instruments, did he not? A. Will you please repeat that?

"Q. I said after you executed these instruments that have been introduced into evidence, Mr. Inman, through your attorney, Mr. Orgain, asked you to execute other instruments in carrying into effect these instruments which have been introduced and identified, you signed some other papers, in other words, after you signed this up there in Mr. Orgain's office, Mr. Orgain

had in his office? A. I think so, but I don't remember what they were.

"Q. At the time that you executed them —do you have copies of those instruments? A. I don't know. Do you have them?

"Q. No, ma'am. A. I may have them, I don't know. I have never read those papers.

"Q. Mrs. Parr, I hand you a number of photostatic copies of instruments here and ask you if a picture of your signature appears on those? A. It does.

"Q. Now, some of those instruments show to be dated December 31, 1951 and some March 6, 1952. Tell this jury whether or not all of these were signed at the same time? A. Well, I really don't remember.

"Q. These were signed subsequent to your signing the instruments that have been introduced into evidence here, that you signed on December 26? A. I am sure of that.

"Q. All right, now, whether these were signed on the 31st of December, 1951, or on the 6th of March, 1952, I will ask you to state whether at the time you signed them whatever times that was, you knew at that time that the net assets, or the nuts and bolts, of the Inman Chevrolet Company was worth more than $75,000.00? A. No, I didn't.

"Q. I will ask you whether or not, at the time you executed these instruments, that whatever time it was, you knew that the profits for the year 1951 exceeded $300,000.00? A. I did not.

"Q. I will ask you to state whether or not at the time you executed these, or signed these papers here, you knew that Chevrolet Motors Division of General Motors Corporation did not require you to sign the instruments you signed on December, 1951? A. No, I didn't know that. * * *

"Q. Did you have any reason to change your reliance on your brother's statement that he never intended to buy you all of the way out at the time you signed these instruments? A. No, I believed him when he said he would not do so unless the Chevrolet people made him.

"Q. And you still believed that at the time you signed these papers? A. Yes, I did. * * *

"Q. Mrs. Parr, by the instruments I have just read to you there on the 1st of January, 1952, Mr. Inman Jr. and Mr. Inman Sr. purported to exercise the option for the additional five per cent of your interest, is that correct? A. Yes, sir.

"Q. When did you learn that your brother wished to exercise the additional option for the last 20% which you had? A. When it was due to be exercised was January, 1953.

"Q. Do you recall about the time of that? A. Well, it was around about the 10th of January, somewhere around that, he called me by phone.

"Q. 1953? A. Yes, January, 1953.

"Q. And how did you find out about that, how did you know he wanted to exercise it? A. He called me on the telephone.

"Q. All right, what did he say to you, and what did you say to him? A. He told me, he asked me to come to the office, he had a check for me, and I thought he meant to come down for a check for the profits instead of that. I said, 'What kind of a check do you want me to get?' And he says, 'I want you to sign this check. I am going to exercise the option.' I said 'Major, that is not what you said; you will do it over my dead body.' So that is the way we ended that conversation.

"Q. Did you go down and accept the check at that time? A. No, I didn't go down. And I didn't hear any more about it until I was down there the first part of March, he asked me to come down again, but that is something else.

"Q. March, 1953? A. Yes.

"Q. All right. What happened out there at that time? A. Well, he told me, he says, 'You know you are out, I have tendered you the money.' I said, 'You haven't tendered me any money.' He said, 'You know about it any way.' He says, 'Jack and, he is in the bank, knows about the check', but I never did receive the check. Did not ever receive it.

"Q. Did not get it? Did you do anything at that time about looking into your rights at that time? A. I went to see Judge Kirkland that night.

"Q. Did you consult with him? A. Yes, I did.

"Q. And thereafter did you do anything about it, as respecting your rights? A. I talked it over with him and he advised me—to see—

"Q. You left it in Judge Kirkland's hands, eventually what happened; did he handle it for you or not? A. He did not handle it, he suggested we go to Mr. Clayton.

"Q. Did you go to Mr. Clayton? A. Which we did.

"Q. Mr. Clayton is now on the District bench here, is he not. A district judge? A. Yes.

"Q. And Mr. Clayton, did he take the matter under advisement for some time? A. Yes. He asked us to bring some books and papers and things up there, and he would look them over, and so my sister and I went up with these things, and he kept them awhile; in the meantime, he was elected as a temporary judge so he could not go on with it. We took it to Mr. Lamar Cecil's office, for Mr. Keith to look them over and he kept them quite awhile, and then we decided we would not wait any longer. He said he was so busy, so Mr. Clayton suggested you and we took them to you.

"Q. Came to me sometime in the month of March, 1954, did you not? A. I believe so.

"Q. And I believe you filed suit here on January 3, 1955? A. That is right.

"Q. And you testify to this jury here that some attorneys have had this matter in their hands since the month of March, 1953, is that correct? A. Yes, I think it was the 2nd week before the 15th of March, 1953."

"Q. I believe you previously testified you left it entirely up to your brother, M. G. Inman, insofar as the operation of the business is concerned? A. That is right. I did.

"Q. Did you and your sister, Mrs. Booth and your brother, M. G. Inman, Sr. have any understanding or agreement about the time of May 3, 1947, as to what your brother, M. G. Inman would get out of operating this business over and above what you all would get out of it? A. No, sir, I did not have any agreement or understanding, nor discussion about it.

"Q. You did not have any agreement about it? A. Absolutely did not.

"Q. Did you all discuss with reference to what was to happen to the business after it was taken out of administratorship? A. Never.

"Q. Never? A. I didn't ever.

"Q. Did it seem in any way strange to you that your brother, M. G. Inman, Sr. would undertake to get this franchise in his individual name and operate the business down there, giving his time and attention and skill to it over a period of 1949—I mean 1947, 1948 and 1949—and get no more out of it than what you and your sister were getting out of it, who gave nothing? * * * A. Do you want an answer?

"Q. Yes, ma'am. A. I don't think it is so that he didn't get more out of it than I did. I think that he did, and I think that

he has really gotten a lot out of it, and everyone else would say so also.

"Q. Do you know what, specifically, he has gotten out of it more than you have during the years that I have mentioned? A. During 1951, he got a salary of $18,000.00, I believe.

"Q. I understand that. That was pursuant to the partnership agreement which has been read to the jury. A. He got that, that was before that.

"Q. My question is, during 1947, 1948 and 1949, he operated this business and it was a very profitable business, was it not? A. Yes, but he could not have gotten it with—

"Q. My question is: Did it seem in any way strange to you that he would manage that business those three years and not get any more out of it than you and your sister would get out of it, who gave nothing? A. I don't think so. I didn't think so anyway, because I didn't think that he was entitled to more than we were.

"Q. Even though he did all of that? A. He was getting the $18,000.00 a year for his time.

"Q. He didn't get $18,000.00 for 1947, did he? A. I don't know, but he couldn't have gotten the business if we hadn't cooperated with him.

"Q. He didn't get any $18,000.00 in 1948, did he? A. No, but he couldn't have gotten that business to start with— look what he got out of it in money.

"Q. And he didn't get $18,000.00 in 1949? A. No, but he got a lot out of it.

"Q. Did he get any more out of it than you got out of it? A. No, but he couldn't have gotten it without us, or if he had had Irene in there, it would have been even more so, and he wanted to get her out so he could have it for himself, is what I think, that is what I think about it.

"Q. Now, it is true during the years 1947, 1948 and 1949, you and your sister, Grace Booth contributed nothing toward the business of Inman Chevrolet Company? A. I don't feel that way, Mr. Rienstra.
* * *

"Q. Now, in and around Christmas of 1949, you said your brother, M. G. Inman for the first time mentioned to you about buying out your interest in the business? A. I didn't say that was the first time, but it may not have been the first time; I cannot remember, you know, the dates, but I do remember talking to him around Christmastime, and I think it was 1949; it may not have been 1949. It was prior to 1951, I don't know how far, you know, before.

"Q. Well, what did he tell you on that occasion? He wanted to buy out your interest in the business? A. Oh, yes, he said, for, say, about five thousand dollars, and I didn't even say anything about it, I just thought it was so silly, he said his reasons for it then was he didn't want to be bothered with Edwin, that is my sister's husband, in the event something happened to her.

"Q. Did he likewise tell you on that occasion .he did not like partners in the business? A. I don't know whether he did then, he had told me that.

"Q. When did he tell you that? A. I can't remember the date.

"Q. Well, was it after Christmas in 1949, that he talked to you about buying out your interest in the business? A. Well, he talked quite often about it, every now and then. First one thing and then another.

"Q. He continued to discuss it in 1950, did he not? A. I don't remember the date '50, I don't remember very much about it, to tell you the truth. I don't remember the dates on it, except in 1951, I mentioned a few dates, as I remember it.

"Q. Didn't he advise you on numerous occasions that when the administrator was released, the administratorship was wound

up, he was not going to operate the business on the same terms he had been operating the administratorship? A. I don't know what he told her. He did not tell me that. He didn't to me.

"Q. He did not tell you that? A. No, he did not. He didn't ever tell me that.

"Q. He never did tell you that. A. No, he didn't.

"Q. When was the first time he left any instrument for you regarding buying out your interest in the business? A. I think it was that little paper that he left that day when he came with a paper with Mr. Bruce about getting us to sign to relinquish him as administrator. I think that was the day when he left a paper.

"Q. At the time you signed the release of the administrator? A. Yes. * * *

"Q. Mrs. Parr, during the year that your brother, M. G. Inman Sr. was acting as administrator of the Inman Chevrolet Company, you knew that the books of the estate and the books of the Inman Chevrolet Company were audited every year by the accounting firm of Mazur & Staggs, of Port Arthur? A. Yes.

"Q. All right, you received every year a report of that audit, did you not, Mrs. Parr? A. Most every year, but I didn't read those audits, either. * * *

"Q. Did you ever look at it from the standpoint of seeing what it showed as to what profits were being made from the operation of the Inman Chevrolet Company? A. No. I didn't. Because most of the money that was made would be— for several years, was either put into the building fund—we had a building fund, the three of us—and the balance went to the—you know—to income tax.

"Q. Income tax? A. And I had very little left.

"Q. But you did receive profits from the operation of the business? A. Yes, the profits went into the building fund;

that is where they went into the inheritance taxes, and other expenses.

"Q. And your income tax? A. My personal income tax, yes.

"Q. But did you ever look at these reports, for instance, here, contents— A. No—I never saw that.

"Q. Exhibit B, 'Statement profits and loss.' A. No, I never did read that.

"Q. Did you ever turn over to Exhibit B— A. No, sir.

"Q. —and see that it tells you about the profits were of Inman Chevrolet Company? A. No, because—

"Q. It has up there, 'Estate of Philip B. Inman, Statement of operations—Inman Chevrolet Company, year ended December 31, 1947.' 'Profit from Operations,' for that year—will you read to the jury what that tells you? A. Let me have it, please. (Counsel hands to witness) Where it says 'totals'?

"Q. 'Net profits from operations.' A. $188,824.26.

"Q. All right. Now, you never did read that? A. I never did read that. * * *

"Q. What is it he said he was going to do in connection with that instrument, he left it with you to read it, did he not? A. He wanted to send it to the Chevrolet, because they wanted us to—give an option, and that was why we signed it, because he said they demanded that we sign something in order for him to get a new franchise, and it was October was the month they usually get it, as far as I know.

"Q. All right. Did he leave that instrument in your possession before you signed it? A. I don't remember he did, but I remember being down in the office, if that is the one I signed. Grace handed it to him and said, 'Here it is, Major, it looks as though you can put us out if you want to.' He said, 'Who said they were going to put you out?' He said, 'I am not going to put you out—I don't intend to

put you out unless they force me to.' (The Chevrolet people).

"Q. Did Mr. Inman say anything to you in connection with that instrument, about that he was not going to continue operation of that business under the same conditions he had been operating it during the administratorship? A. About that paper?

"Q. Yes, ma'am? A. No.

"Q. What did he say to you about going down to the office and calling Mr. Mingle and telling him that he was not going to have the franchise renewed? A. He said if we did not sign that paper (I am not sure it was this paper) but a paper, a small paper, if we didn't sign it that night by nine o'clock, he was going to call Mr. Mingle in Dallas and tell him he was going to give up the dealership.

"Q. Why did he say he was going to give it up? A. Because he said he wanted to, because we would not sign that paper giving him an option.

"Q. He told you in that connection, did he not, Mrs. Parr, he was not going to operate the business in view of the fact you all would not comply with the agreement you all had made whereby he would get the business after administratorship? A. He didn't tell me that, because I never made an agreement with him.

"Q. Well, whether you made an agreement or not, did he tell you that? A. If he told me.

"Q. No, regardless of whether you made such an agreement or not, did he tell you he was not going to operate the business under those circumstances any further? A. Not that night, no.

"Q. Did he ever tell you that? A. Did he say it like that, no.

"Q. How did he say it? A. He told us if we did not sign that option, the Chevrolet people were trying—wanted that option, and that he had—we had to sign

it, to trust him, that is what we needed to do. He didn't intend to put us out entirely unless they made him do so.

"Q. You say he did not say anything to you about that he was not going to operate the business— A. If we did not sign that option, he did.

"Q. —like he had been operating it in administratorship where he was doing all of the work, and for every dollar you all earned, you and your sister would get two-thirds and he was getting one-third, did he say that? A. Not that night, no.

"Q. Did he ever say anything like that? A. Oh, he had lots of complaints, he had lots of things, reasons, it was one person or this, that, and the other, but as far as specifically what he said, or when he said it, I don't know. But I am telling you what he said that night. I told you what he said.

"Q. As a matter of fact, since the conversation you described awhile ago around Christmas of 1949, clear on through 1950 and into 1951, he told you and your sister, Grace, that as soon as he finished re-building the building, the business was taken out of administratorship, he was not going to operate it any further under those conditions, did he not? A. Not unless we signed the option.

"Q. All right, is that the reason you signed the option, then, just for looking at? A. I signed it like I told you because he told me that the Chevrolet people were going to put him out and cancel us all out if we did not go ahead and sign that option.

"Q. He told you he going to call Mr. Mingle— A. Give up the dealership. It was a threat.

"Q. You knew enough about the business, operation of franchise, that if he gave up the dealership, did not operate the business any more, that you all would have practically nothing there, would you? A. I would not say that.

"Q. Well, you would not have any new Chevrolet automobiles to sell, outside of what the nuts and bolts and cars on hand were worth, you would not have anything, would you? You understood that, didn't you? A. I didn't understand that, and I don't think so.

"Q. Well, what other value would you say there was to the business if he would give up the franchise? A. There was an awful lot of cars down there.

"Q. Well, if he had called up Mr. Mingle that afternoon and told him he did not want the franchise renewed because he was tired of doing business under the circumstances, what would there have been about the business— A. The profits for that year to be divided equally and all of the automobiles on hand, and all of the other things down there, as far as I know, I am not a business woman, if I were I could discuss it with you, but I can't.

"Q. Would it be the profits up to the time— A. October, if I had signed the agreement; we did not sign it until the 26th of December.

"Q. The instrument the jury is looking at now— A. That was simply—he told us merely a letter to inform the Chevrolet people that we were will to do that. And that is what he wanted us to sign. Otherwise, it was more or less so he could go ahead and get the franchise, that is what he said.

"Q. Mrs. Parr, in connection with that very instrument, the jury is looking at now, you say was signed in October? A. I think; I am not sure.

"Q. That you signed, didn't your sister, Grace Booth, call your attorney, Mr. Will Orgain, on the phone, and discuss the matter with him? A. You will have to discuss it with her, I don't know what he said and I don't what she said.

"Q. Didn't she call him in your presence? A. No.

"Q. All right, now. When was it you first went to Mr. Orgain with reference to the transactions and these proposals that Mr. Inman made to you? A. I think it was after the paper was left there, after the day of the release of him as administrator.

"Q. That would be sometime after March 28, 1951? A. I think it was April or May, it seems to me, I don't remember.

"Q. All right, what was it? What was the reason Grace and you went to see Mr. Orgain? A. What was the reason?

"Q. Yes ma'am? A. I don't think we went to see him for about a month or so, because Grace left the next week and was gone about a month.

"Q. In case the jury don't know, that is Mr. Will E. Orgain in Beaumont, an attorney here in Beaumont, is it not? A. Yes.

"Q. And he is the head of Orgain, Bell & Tucker, here in Beaumont, is that right? A. Yes.

"Q. And you had been up to his office previously in connection with business affairs? A. Various things, but very little.

"Q. And you testified, I believe, this morning, that you trusted and had implicit faith in your brother, M. G. Inman? Why was it that you went to Mr. Orgain, in connection with this transaction? A. Because the very first time I began to lose faith was when he left that paper there about the lease and that option. I did not think that looked very good about that lease, I did not understand it, and I had to have someone explain it.

"Q. That was March 28, 1951? A. I am not—well, I did not go then, it was at least a month or six weeks later.

"Q. That is when you began to lose faith in your brother, you say? A. Well, that paper made me suspicious.

"Q. So you decided you had better not put your faith in your brother? A. No, I didn't decide anything. I will tell you what decided me, we took that letter.

paper, to Mr. Mazur, and he said, 'Girls, this is murder.' He asked me why I took it to Mr. Orgain—and I am telling you.

"Q. Well, did you take the paper up to Mr. Orgain after— A. After that.

"Q. All right, did you sign that paper after Mr. Orgain looked it over? A. No, sir, I didn't.

"Q. All right, after that time, after you first went to see Mr. Orgain, all of the negotiations with reference to the sale of your interest in the property was carried on between Mr. Orgain, as your attorney, and Mr. Bruce, as the attorney for Mr. Inman, isn't that true? A. Not at that time.

"Q. All right, after the first date that you went to see Mr. Orgain, which was after March 28, 1951— A. After July, 1st of July.

"Q. About the first of July. A. After sometime I would say the first of July.

"Q. Now, from that date on until December 26, 1951, when you signed these instruments in your lawyer's office, did you have any further negotiations with Mr. Inman personally? A. Oh, yes. * * *

"Q. You testified that you went to see Mr. Orgain first in connection with these negotiations according to your best recollection— A. That is not the first time I went there. Lots of times, for various reasons, I can't tell you what.

"Q. Talking about these? A. I don't remember.

"Q. You said it was in July? A. I said I think my sister was away the month of June, and she didn't go—we didn't go until she came back. I am just guessing.

"Q. Your best estimate it was July, 1951? A. I just think maybe it might have been then.

"Q. Now, did you— A. That is the paper that Mr. Bruce suggested that I sign without reading it.

"Q. All right. So you took it to Mr. Orgain's office? A. Yes, but I did not think that looked just right.

"Q. So you didn't sign it? A. No, I didn't.

"Q. Do you know then what negotiations were carried on between Mr. Orgain, your attorney, and Mr. Bruce, attorney for Mr. Inman. A. No, I don't know. I know very little about it.

"Q. You know very little about it? Did you have further discussions with Mr. Orgain after July, 1951? A. I did not say July, I said in preparation of this—

"Q. After July, 1951, did you have further discussions with your brother, M. G. Inman, regarding this? A. I am sure I did, but I can't tell you when or what was said, or anything.

"Q. Can you tell the jury one instance, or one place— A. I told you.

"Q. Where you had any transaction— A. I told you about that Thursday afternoon when he came up there and talked, at my apartment, and my sister was there. However, that was not the day that he brought that paper that he wanted, that is the first time, he said he was positively going to have to have that option signed, that the Chevrolet people wanted him to, and he wanted us to do it.

"Q. Is that the date, is that the date you say you signed this? A. That was later—a few days later, if I remember rightly. I think that was October. I think it was October. I am just guessing. There is no date on there—I don't know the date.

"Q. I understand. You gave your testimony because your best recollection is it was October, 1951? A. I think so. I think it was, now.

"Q. Is that the only instance that you ever talked to Mr. Inman? A. Oh, no.

"Q. Wait until I finish my question, Mrs. Parr. Is that the only instance you ever

talked to Mr. Inman about any option or about selling your interests? A. No.

"Q. Until the time you saw Mr. Orgain perhaps in July, 1951, up to December 26, 1951? A. I couldn't say; that I can't say. I don't recall if that is the time.

"Q. You don't remember any other day? A. I can't. I just don't remember the date.

"Q. All right, and on this occasion you say was in October? A. I think.

"Q. You think? He left this paper with you? A. He didn't leave it with me.

"Q. To read if you wanted to? A. I don't know whether he left it or kept it, but anyway, we went on down to his office on Sunday, I think.

"Q. You went down there after he told you he was going to call— A. He was going to the office to call Mr. Mingle.

"Q. To call Mr. Mingle? A. Yes, sir.

"Q. And you knew who Mr. Mingle was, didn't you? A. I imagine.

"Q. Mr. Mingle was what is called Zone Manager of Chevrolet Motors Division? A. Yes, I have heard of Mr. Mingle quite often. I don't know him personally.

"Q. You knew he was the man who signed these franchises on behalf of Chevrolet Motors, didn't you? A. Well, now, really, I am not certain that he was the one, because I didn't know. I thought that the one in Houston did that, was the one who did that, and at that time Mr. Mingle was in Dallas, so I don't know whether he did or not. He told me he was going to call Mr. Mingle.

"Q. Mr. Inman told you he was going to his office, that he was not going to operate the business any further like it had been going, he was going to call Mr. Mingle? A. That is right.

"Q. He told you that he was not going to renew the franchise, is that right? A. If we did not sign the option.

"Q. If you did not sign the option? A. That is right.

"Q. All right; you knew what it meant if the franchise was not renewed, didn't you? A. Yes.

"Q. So you and your sister Grace discussed the matter, and then your sister called your attorney, Mr. Orgain, did she not? A. She said she did. I wasn't there, I don't know. * * *

"Q. After your sister talked to Mr. Orgain, and after you read this over— A. I didn't read it over.

"Q. Well, did your sister explain it to you? A. No, we went down there with it, as I remember, signed it and handed it to him, if I remember right. It has been so long ago I don't remember the details, and I don't remember—

"Q. Anyway, you decided the best thing for you to do was to go ahead and sign this instrument? A. No, he said we had to; he was not going on, the Chevrolet people insisted that he have the option. That is what he told us.

"Q. That is Defendant's Exhibit here No. 12, which you say you signed in his office then, is that right? A. I don't know where I signed it. My name is on it, so I am sure I signed it. My name is on it, and I think, you know, it was either signed there or might have been—I don't know where else I could have signed it, but I didn't go to Grace's house to sign it. I don't remember signing it in my apartment, so I must have signed it down there.

"Q. But you did sign it? A. My name is on it.

"Q. Yes, ma'am, and you meant to sign it because— A. I didn't.

"Q. —you know that Mr. Inman was going to give up the dealership? A. You know, I didn't know that.

"Q. You didn't know that? A. No, I didn't know that. He said he would.

"Q. He said he would? He went to his office, didn't he? A. He said he would wait around until 9:00 o'clock, he said he would wait there until 9:00 o'clock, he said he must agree to sign that paper that night.

"Q. You showed up there before 9:00 o'clock? A. After when?

"Q. You showed up there before 9:00 o'clock, too, didn't you? A. I wouldn't know. I really don't remember the time.

"Q. Now, after you signed this instrument (which is defendant's Exhibit 12), you understood that there was still some negotiations to go on about the lease on this property down there at Port Arthur, too, didn't you? A. That was not even considered as being a definite thing, that was to show the Chevrolet we were willing to do something about it. That was not what I consider a real option, that is—

"Q. You agreed to do certain things in here, didn't you? A. I read it, you allowed me to read it, but I didn't consider I signed the option that day. I considered I signed the option—

"Q. All right, after you signed that you say sometime in October, 1951? A. I think it was.

"Q. When did you next go to Mr. Orgain's office? A. I don't know; I don't remember.

"Q. Did you have any discussion with him with reference to the terms of this lease contract you signed December 26? A. I discussed very little about that lease, there was so much complication between Mr. Bruce and Mr. Orgain, and I don't know—I was just there, that is all.

"Q. When you signed this instrument here—defendant's Exhibit 12, (which you say was, you think in October of 1951) there wasn't any discussion about the profits of the business, was there? A. None whatever.

"Q. And there weren't any— A. The profits weren't mentioned.

"Q. There was not any discussion about the net worth of the business? A. No, no discussion, but Major had told me it was only worth $75,000.00.

"Q. He told you the physical assets you all had down there, cars, nuts and bolts— A. He did not mention cars, he just said nuts and bolts.

"Q. Less liabilities you owed, was approximately— A. He did not mention anything, except nuts and bolts.

"Q. He did say that was about the value of the business at that time? A. He did say that was the value of it, about $75,000.00. He said mostly it was for nuts and bolts.

"Q. Of course, you knew that he had some automobiles down there, didn't you? A. Yes.

"Q. How is that?

"Mr. Walley: I couldn't hear you. A. Yes.

"Q. Both old and new? A. Of cars. Yes.

"Q. How many times were you in Mr. Orgain's office after you signed this paper (defendant's Exhibit 12)? A. Can you remember how many times you went somewhere about seven—how many years ago— about five years ago?

"Q. Well, were you in his office a number of times? A. I imagine I was; several times, at least.

"Q. Did you take with you when you went to Mr. Orgain's office at the time you had lost faith in your brother, did you take to him— A. I hadn't lost faith in my brother, then.

"Q. Did you take to Mr. Orgain these audit papers? A. No, I did not ever. I

had not lost faith in my brother then, I believe it was more of an argument than losing faith. We just did not agree on the same things.

"Q. Did you ever take up to Mr. Orgain's office copies of these audit reports? A. If I ever did, I don't remember it, and I know I didn't in 1951, because I didn't—no, I didn't have one of those then, for 1951.

"Q. What was it you said this morning your brother, M. G. Ingman Sr. told you about the copy for 1951? A. He did not tell me anything about the profits for 1951, ever.

"Q. He did not say one way or the other? A. Not ever.

"Q. He didn't say they were going to be big or whether they were going to be little? A. He did not say anything about the 1951 profits to me, but I could—

"Q. You knew all during 1951 that in all probability the business was making a considerable amount of money, did you not, Mrs. Parr? A. How would I know that? I didn't know.

"Q. Did you get any checks for previous years out of the business? A. In 1951?

"Q. No, for the years before 1951? * * *

"Q. Now, Mrs. Parr, in view of the fact that you had no discussion about the profits for the year 1951, either with Mr. Inman or your attorney, you didn't consider that profits had anything to do with the trade you were making, is that correct? A. I did not think about the profits. Most of the discussions, as I remember, were concerning the lease of the building, and it was based on a percentage, which I did not understand the whole thing, and it was between Mr. Orgain and Mr. Bruce.

"Q. That was most of the discussion taking place? A. As far as I can—as far as I can—as well as I can remember, and the other was, you know, that the option was to be signed because that is the way the Chevrolet people wanted it, from Major. But as to the profits, they were not discussed. I didn't discuss them with Mr. Orgain at all.

"Q. You didn't think they were important, did you? A. No, not after he said what he did, I mean after Major said what he did.

"Q. Mr. Tatum:. Beg your pardon? A. I said I did not think they were important, I said no, not after Major had said what he did, that summer or fall, early fall.

"Q. He didn't say it to you, did he, Mrs. Parr? A. No, he didn't.

"Q. All right, did Mr. Orgain ever ask you what the profits were being made by Inman Chevrolet Company? A. No. If he did, he knew I didn't know them.

"Q. So far as you know, he never did ask you? A. No, he never did ask me, because I didn't know them.

"Q. Did he ever tell you what, if anything, he knew the profits of Inman Chevrolet Company for 1951? A. Well, that just was not the issue, as I understood it. It was mostly the lease business for the building.

"Q. Yes, ma'am? You don't recall him saying anything to you about the profits? A. He did not know about what those profits were.

"Q. Of the Inman Chevrolet Company for 1951? A. He didn't know. I have heard since he didn't know.

"Q. At least, he did not say anything to you about it? A. He did not tell me anything about the profits. * * *

"Q. (By Mr. Reinstra) Mrs. Parr, I believe yesterday you identified plaintiff's Exhibits 4, 5, 6 and 7 as the instruments which you executed in your attorney's office on December 26, 1951, did you not? A. Well, that is my signature. I didn't read those, either.

"Q. You didn't read them, any of them? A. No, I just signed them as Mr. Orgain suggested.

"Mr. Walley: I can't hear you Mrs. Parr? A. I signed them, but I didn't read them.

"Q. Did Mr. Orgain explain them to you? A. Not—well, I guess he did.

"Q. You understood what they were? A. Yes, I knew what they were about.

"Q. The first one here (plaintiff's Exhibit 4) that is signed by you and M. G. Inman Jr. and in the first paragraph you say that, 'In consideration of $6,249.98 paid to you by M. G. Inman, Sr.,' you have sold to him an eight and one-third per cent (8⅓) interest in and to the Inman Chevrolet Company in Port Arthur, is that correct? And witnessed? A. At the time I signed this paper, I couldn't have told you whether it was there or not. I just signed it because he said that is where you put your name. I was crying, so I could not tell you.

"Q. Who told you that, your attorney? A. Yes.

"Q. Did he explain to you what that was? A. I did not understand that paragraph. He didn't go into the paragraphs, he just said 'this is thus and so.' * * *

"Q. You didn't read it either? A. No.

"Q. Did Mr. Orgain explain it to you? A. I imagine he did. I don't remember too much about it.

"Q. You didn't understand it before you signed it? A. No. I was in the habit of signing papers without reading them; so I didn't.

"Q. But anyway, you signed it on the advice of your attorney, Mr. Orgain, didn't you? A. And on Major's promises.

"Q. You hadn't seen Major since October? A. I would not say I had not seen him since October.

"Q. You didn't talk to him about this? I don't remember discussing the partnership at all with him.

"Q. With Major? A. I do not remember it.

"Q. So you must have signed it on the advice of your attorney? A. I don't know whose advice it was.

"Q. You were in his office? A. I was in Mr. Orgain's office, I guess, when I signed it, I imagine.

"Q. Your sister, Mrs. Booth, was in the office at the time with you? A. No, she was not in the office when I signed it. No one was in there but Mr. Orgain.

"Q. Mr. Orgain and you? A. Yes, sir. That is right.

"Q. You must have on his advice? A. I must have on somebody's advice.

"Q. Plaintiff's Exhibit 7 is the lease agreement? A. I don't understand that, yet.

"Q. You don't understand that, yet? A. I don't think I ever will, but I signed the papers.

"Q. Did Mr. Orgain explain that to you? A. Yes, but it is so complicated I can't understand it. * * *

"Q. With respect to this option to M. G. Inman Sr. and Jr. whereby you gave them the right at any time after December 31, 1952, to buy your undivided 20% interest in said business for the sum of $15,000.00, did your attorney, Mr. Orgain, advise you that your brother, M. G. Inman, Sr., and this instrument would have to be absolutely correct before he would buy that interest from you? A. He did.

"Q. He tell you? A. I understand that he had the legal right. That is all you want to know, isn't it?

"Q. Yes, and the legal right? A. I understood that he had the legal right to do so.

"Q. Now, do you recall when you were next up in Mr. Orgain's office after December 26, 1951? A. No.

"Q. You were back up in his office after that date, were you not? A. Yes, I was.

"Q. I believe yesterday you identified some other instruments that you signed in Mr. Orgain's office? A. I signed them. I think I must have signed them up there, I don't remember exactly.

"Q. Was that sometime in March, 1952? A. I am not certain just when it was, but I believe they are dated in March, aren't they?

"Q. That is these instruments here that —marked yesterday as plaintiff's Exhibit 10, plaintiff's Exhibit 9, Plaintiff's Exhibit 12 and Plaintiff's Exhibit 11, and Plaintiff's Exhibit 8? They all bear your signature, do they not? A. Yes, sir, that is right.

"Q. And you signed all of those in your attorney's office, did you not? A. I don't remember signing them.

"Q. Well— A. I signed them.

"Q. Can you tell us where you signed them, if you didn't sign them in his office? A. No, I can't. I think I did, but I am not certain. * * *

"Q. I see. I believe you testified yesterday it was about January 10, 1953, that your brother, M. G. Inman Sr. called you over the phone and told you he had the check. ready. He wanted to exercise the option on the remaining 20% of your interest? A. I told you I thought it was about January 10.

"Q. Yes, ma'am? A. Approximately. It wasn't long after the first of the year.

"Q. It was shortly after the first of the year? A. I wouldn't say definitely, but I believe it was about the 10th.

"Q. I believe you said right after the first you had gone to Dallas or some place? A. I don't remember; I didn't say that.

"Q. I thought you said you were out of town and you returned about January 10? A. No.

"Q. That is when he called you? A. No; I don't remember whether I went to Dallas that year or not, but I may have—

"Q. Well, he did call you over the phone and asked you to come down to the office? A. The early part of January is all I can tell you.

"Q. He told you that he wanted to exercise the— A. He did not tell me that.

"Q. He told you that he wanted to exercise the option? A. He did not tell me that.

"Q. What did he say? A. He said, 'I want you to come to the office. I have a check I want you to sign,' and I thought it was for the profits. Sometimes he had me to get the check before or by the 15th of January, so Mr. What's his name, you know, could make an estimate of the income tax and I said, 'What kind of check is it?' I said, 'Which check, or what check?' And he says, 'Oh, I am going to exercise the balance of that option.' And I said, 'That isn't what you said,' and I said, 'that isn't what you said, you will do it over my dead body.'

"Q. All right, then you refused to go to the office? A. I refused to do it, and I didn't go down there."

Honorable Will E. Orgain, an attorney in Beaumont for many years, testified, in part, as follows:

"Q. Mr. Orgain, do you know the plaintiff, Mrs. Ruth Parr, here, and the cross-defendant, Mrs. Grace Booth? A. I know them both.

"Q. Did you have occasion to consult with them professionally sometime in the summer or fall of 1951? A. I had—They consulted with me, yes.

"Q. And did they or not consult with you with reference to a proposed transaction of their brother to purchase and get

options to purchase their interests in the Inman Chevrolet Company? A. Well, out of those consultations that event grew. There was some purchases, and I think there was an effort being made at that time by him to purchase.

"Q. All right, sir. And during the course of that did you represent them as their attorney during all of that time until December the 26th, 1951, at which time they executed the instruments? A. So far as I know, I believe the first consultation was along in the spring of '51.

"Q. And they continued until about the 26th day of September—of December, 1951, did it, Mr. Will? A. Yes, and sometime thereafter.

"Q. Sometime thereafter? Mr. Orgain, I hand you a document here that has been identified and offered into evidence and admitted into evidence as a Plaintiff's Exhibit here. I will ask you to state whether or not those instruments are the ones that were eventually signed up by Mrs. Parr and Mrs. Booth on the 26th day of December, 1951? A. I would say thereabout, I know they were a continuation of negotiations concerning them and there were two sets of instruments, I think one about the 26th somewhere shortly after Christmas.

"Q. Yes, sir. A. And the other one I think was dated a little bit later.

"Q. Yes, sir. A. Perhaps the next year in January.

"Q. During the course of the consultations between you and your clients, Mrs. Booth and Mrs. Parr and Mr. Edwin Booth, did you have occasion to talk with Major Inman, Senior and Graham Brice, his attorney? A. Yes. There was some conversations with them and with the clients, jointly by all of us, and some separately with each of us.

"Q. Yes, sir. Now, during that time of those conversations state whether or not Mr. Inman ever represented to you or

to these ladies, or to you and the ladies, what the worth of that Inman Chevrolet Company was? A. Well, I assumed the representation, there was a statement in connection with a proposed purchase as to the values of the physical assets of the Chevrolet Company.

"Q. All right. And would you tell the jury what those statements were that were made? A. Well, they—you mean in dollars and cents?

"Q. Just as well as you can recollect, what was said, yes, sir. A. There was some conversation between them. Mr. Major Inman, as I recall it, he was seeking to purchase the interests of these ladies, or at least a portion of it,—

"Q. Yes, sir. A. —for himself and his son.

"Q. Yes, sir. A. And, naturally, and he wanted the deal in effect to the extent of his purchase as of January 1 of that year,—

"Q. Yes, sir. A. —which covered a considerable period of time.

"Q. Yes, sir. A. Naturally there came up a discussion. 1. As to the physical assets of the Company.

"Q. Yes, sir. A. And to some extent as to what the Company was doing and the profits from the business.

"Q. Yes, sir. A. And he was making an offer—I don't recall exactly what it was,—but in connection with it they asked —there was some question raised as to what the assets were worth.

"Q. Yes, sir. A. It was a partnership, it was threatened by him with two problems in connection with the purchase. It was stated that if he couldn't make a purchase the dissolution of the partnership would take place.

"Q. Yes, sir. A. In which event under the legal rule, as you are familiar with, the partnership assets would not have any value except the physical assets.

"Q. Yes, sir. A. Plus the profits up until that time.

"Q. Yes, sir. A. And a threat to dissolve the partnership was one of the elements in it.

"Q. Yes, sir. A. And so far as I was concerned that was a family affair between them, a brother and two sisters.

"Q. Yes, sir. A. I was, in their behalf trying to keep the thing alive and going because my view was that considerable of the asset value was in a going business—

"Q. Yes, sir. A. —which would terminate with the dissolution of the partnership and the distribution of the assets would be of no value under applicable rule.

"Q. Yes, sir. A. And that he (Mr. Inman) position was that the Chevrolet Company wanted to get the ladies out of it because they were not personally in the business, etc., and he wanted to acquire it.

"Q. Yes, sir. But we wanted to postpone the time, and trying to string it along, or really avoid it, if we could, and, in that connection there was some statement made by him to the effect that—well, he said so far as the physical assets of the Company, they were just—he said something about the number of cars, said they had no cars, it was just nuts and bolts, perhaps a value of seventy or $75,000.00, but only would it have that value if it could proceed and he sold out in the regular course of business.

"Q. Yes, sir, now, did he say anything to you about the profits that were being made during these negotiations when you inquired about those? A. I remember no statement about that except that a general statement that the business was poor and the profits were inconsequential.

"Q. Yes, sir. And that was made during the course of these negotiations? A. Yes. I wouldn't say just when. We had a good many conversations about it. ·

"Q. Was that repeated more than once, Mr. Orgain? A. I feel quite—my recollection is that it was, several times.

"Q. Now, Mr. Orgain, there is a provision, if you will recall, in these agreements and options here (I believe I have already handed them to you) that Mr. M. G. Inman, Sr. will have the right after December—after December the 31st, or January 1, 1953 to exercise an option to purchase the last 20% of Mrs. Parr and Mrs. Booth here, each, for $15,000.00. During those negotiations did Mr. Inman, in your office, make any representation as to his intention with respect to that, that last 20%? A. Well, there was considerable argument between them as—about the provision.

"Q. Yes, sir. A. The women didn't want to sell. He was insisting on them selling.

"Q. Yes, sir. A. And the representation being, as I recall it, that the Chevrolet Company would not let them continue with the agency unless he did buy it.

"Q. Yes, sir. A. And at least to the extent of the—of a major portion of it.

"Q. Yes, sir. A. And he was insisting on putting himself in a position where he could represent to them that he had these options to buy the whole of it.

"Q. Yes, sir. A. And he wanted not only a contract to that effect but he wanted letters to that effect, both of which he got.

"Q. Yes, sir. A. And would—just—I think as to that last option, or some occurring after the first option—

"Q. Yes, sir. A. He stated—my recollection of it is—that he must have this contract but so far as its exercise he would not exercise it fully except to the extent that it was required of him by the Company.

"Q. Mr. Orgain, during the course of the conferences between you and Mr. Inman and Mr. Graham Bruce did Mr. Graham Bruce ever tell you that the profits

of that business for that year were amounting to something in the neighborhood of $200,000.00 for 1951? A. I don't recall that, and I don't remember his saying anything to me about the profits—I don't recall any conversation with Mr. Bruce concerning the profits of the Company. It may have been.

"Q. You think that—A. If so, I wasn't impressed with it.

"Q. Do you think he may have told you that the profits for the year 1951 on an instrument you were to date back to the first of January were $200,000.00? A. I say he may have told me, but I have no recollection. I wasn't impressed by it if he did.

"Q. You would have been impressed—? A. I assume, if I had realized such a statement it certainly would have impressed me as being contrary to all of the representation.

"Q. Contrary to the representation that the profits were inconsequential, is that correct? A. Contrary to the representation and the conversations prior to that time. I don't know what time you refer to.

"Q. During the negotiations, there throughout the negotiations? A. I don't remember—I just don't remember having that conversation with Mr. Bruce.

"Q. On the date that these instruments were signed in 1951 in December, who was present in your office when they were signed, Mr. Orgain? A. Well, I think when they were signed only the two ladies. I don't know whether they were both present at the same time.

"Q. Was Mr. Bruce over there that date to the best of your recollection? A. I don't think he was.

"Q. Now, after these instruments were executed I will ask you to state whether or not at the insistence of Mr. Bruce and Mr. Inman these ladies executed some other instruments in your office, or elsewhere? (Hands to witness.) A. Yes. These let-

ters I referred to that he wanted the contracts and he wanted letters executed by these ladies. They were executed. Let's see what this other one was. One was—this one was executed (which is Plaintiff's Exhibit 12, is it?)—

"Q. Yes, sir. A. Was somewhat earlier, and this second one was (which is Plaintiff's Exhibit 18) was some considerable time later, as I recall.

"Q. It was dated March the 6th, is it, Mr. Orgain? A. Yes.

"Q. Now, at the time that—were the ladies present in your office when they signed those documents, or do you recall, Mr. Orgain? A. I feel pretty sure they were. I don't know whether they were present with each other, but they were in my office when this one dated December 31st.

"Q. Now, Mr. Orgain, at that time that they signed that and the instrument that you now have there before you, one letter from—on your letterhead, with reference to a claim for underpayment, etc., and the others bills of sale in connection with the instrument that was previously signed, did you—were you furnished at that time any information with respect to the profits of the Inman Chevrolet Company by Mr. Inman, or by these ladies, or by anybody else? A. I would say no, not at that time.

"Q. All right, And did you have before you any additional information at that time as to the value of the physical assets of that business? A. No.

"Q. Did you have any different information as to Mr. Inman's intention with respect to exercising all of the last option at the time they executed those? A. No. I never heard anything different from his original statement."

Mr. M. G. Inman, Sr., one of the appellants, testified in part, as follows:

"Q. Now, in the proper management and operation of the Inman Chevrolet Company in Port Arthur, did you have any

discussions with Mrs. Parr with reference to re-building this building that had been damaged and destroyed by fire? A. Well, before I got the franchise, before I got the selling agreement, I came back after Mrs. Booth and Irene came over to Houston and I got back from that a day or two later, and I told Mrs. Booth and then I told Mrs. Parr later, that I would—I made them this kind of a proposition: I would go ahead, thought I could get the deal, then, Mr. Mingle was encouraging about it and thought that I could get it, that I would operate the deal, re-build the burned building and build a new one-story building adjacent to it, and pay all the debts, including everything that this agreement we signed, all of which we agreed to do it, all the debts of the estate, inheritance taxes, any income taxes due on it, any other kind of bills, debts or anything else on it, for their—after I got through that their interest was not to exceed $25,000.00 in the deal, would be mine. That is what I was going to let be my compensation for doing that —this—and they never said they would or wouldn't or anything. They went off up to Mr. Will Orgain. They came back and the best of my recollection, Mrs. Booth came to me and said Mr. Will Orgain thought that was a good deal for them. * * *

"Q. Under agreement of May 3, 1947, signed by you, Irene Inman and Mrs. Parr and Mrs. Booth, certain properties described therein were set aside to Irene Inman, is that correct? A. Yes, sir.

"Q. And those properties were set aside to her free and clear of all expenses, debts, taxes and anything else that might be owing by the Estate of Philip H. Inman, is that correct? A. Yes, sir.

"Q. And in that agreement there were certain properties, the remainder of the properties, were set aside to you and to Mrs. Parr and Mrs. Booth, is that correct? A. Yes, sir.

"Q. And the properties which you all received under that agreement included the residue of that fire there, that was then the Inman Chevrolet Company? A. Yes, sir.

"Q. Is that correct? A. Yes, sir.

"Q. And in the inventory which was filed in the Estate of Philip Inman, deceased, which has been introduced in evidence here, the value of the stocks, parts, accessories, equipment, furniture and fixtures of the Inman Chevrolet Company was set at $35,556.00? Maybe I had better show you this so you can—(handing to witness)—is that correct? A. $35,556.49, yes, sir.

"Q. All right, now, if you were going to operate this business there under that franchise there, do any kind of business at all, you would have to, of course, have to have a place of business to operate from, wouldn't you? A. Yes, sir. * * *

"Q. What did you determine then with reference to what was necessary to do with respect to the burned out building down there? A. Well, it was—another part of the agreement with Chevrolet was that we would re-build the building to have a place to operate. * * *

"Q. All right, sir. Mr. Inman, I want to ask you this question: Before entering into this agreement of May 3, 1947, under which you all assumed all these debts and you were going to use your best efforts to get a selling agreement from the Chevrolet Company, what was there to have prevented you, instead of entering into that agreement, of getting the selling agreement for yourself? * * * A. Well, I didn't need any of them to get the deal. Chevrolet wanted—they would have, for $75,000.00 was all they required— * * *

"Q. You could have gotten it for yourself if you had so wanted to, could you not, Mr. Inman? A. Yes, sir.

"Q. But instead of that you entered into this agreement of May 3, 1947, in which you obligated yourself— * * *

"Q. Well, I will jusk ask you this question. You did enter into this agreement dated May 3, 1947? A. I did.

"Q. Instead of trying to get the franchise for yourself? A. I did.

"Q. The franchise as I read to the jury does run to you, individually, does it not? A. Yes, sir.

"Q. Now, during the—after you got the franchise, of course, you—did you begin then to reconstruct and remodel this building? A. Yes, I think I did, shortly thereafter.

"Q. Will you tell us, Mr. Inman, what efforts you did yourself, that is, personally, over and above the money that was coming out of the profits of Inman Chevrolet Company to pay for material and labor, what you did in the way of managing, overseeing the construction of that building. A. Well, I used quite a bit of my equipment over there on the job, and in addition to that, I built this all back down there, the new and the old, by the day, and supervised the construction of it myself, with different subcontractors, handled it all myself.

"Q. In that connection, did either one of your sisters, Mrs. Parr or Mrs. Booth contribute anything toward the supervision of the repair or re-building of that building? A. No, sir.

"Q. With respect to the operation of the Inman Chevrolet Company, after you got this franchise in 1947, and during the years 1948, '49 and '50, and even in '51, did either one of your sisters, Mrs. Parr or Mrs. Booth contribute anything in the way of supervision or management of that business? A. No.

"Q. Other than the third interest which would be a third of some thirty-five thousand dollars, which we mentioned awhile ago, which they got under this agreement of May 3, 1947, did either Mrs. Parr or Mrs. Booth contribute anything in a financial way toward the Inman Chevrolet Company? A. No. * * *

"Q. Other than—my question, Mr. Inman was—I don't know whether you answered it. A. I answered 'No'.

"Q. They did not contribute anything? A. No, sir.

"Q. With reference to the operation and management and supervision of the Inman Chevrolet Company from the time you got the franchise in 1947, during that year, 1948, '49, and '50, and on into '51, who was performing those duties and services? A. Managing this thing down there, managing the Inman Chevrolet Company?

"Q. Yeah. I say with reference to to management and supervision of it, I say, who was doing those duties? A. I was, personally.

"Q. You were? A. Personally.

"Q. During the years 1947, 1948 and 1949, did you receive any compensation of any character for your management and supervision of the business of Inman Chevrolet Company other than what your sisters, Mrs. Parr and Mrs. Booth got, likewise? A. No, sir.

"Q. Were you familiar with the fact that as administrator of your brother Philip's estate that you are entitled to collect a fee of 5% of moneys received and 5% of moneys *received* as compensation for your services as administrator? A. Yes, sir. * * *

"Q. During the course of your operation of Inman Chevrolet Company during those years and during the period that you were administrator of the estate of Philip Inman, deceased, were all of these debts, taxes, mortgages and obligations that you and your sisters assumed paid off? A. Yes, sir.

"Q. Were the federal and state inheritance taxes paid? A. Yes, sir.

"Q. And from an account already introduced in evidence that amounted to the sum of $138,378.22? A. No, that was in-

come tax; federal and state inheritance tax as the sum of $117,776.42, that was paid.

"Q. That was paid? A. Yes, sir.

"Q. And was the income tax paid? A. Yes, sir.

"Q. Was the mortgage on the—that you described awhile ago, in the amount of $24,000.00 which you described was due to Mr. Yates, was it paid? A. Yes, sir.

"Q. I believe it is already in evidence, but do you know the final approximate cost of re-building the building there, and remodeling it? A. Around $180,000.00.

"Q. Something over $180,000.00? A. Yes, sir.

"Q. Was that paid? A. Yes, sir.

"Q. At the time that you were released as administrator of your brother Philip's estate on March 28, 1951, were all debts, taxes, mortgages, obligations of every nature whatsoever, which were assumed by you and your two sisters, in the agreement of May 3, 1947, were all of those paid off? A. Yes, sir.

"Q. Now, Mr. Inman, are you able to tell us in the event you had not been able to secure this franchise in 1947 for the sale of Chevrolet automobiles, what would have been the value of the Inman Chevrolet Company there in Port Arthur in the condition that it was then in? A. I don't think you could have got $35,000.00 for what they had. * * *

"Q. Now, Mr. Inman, when during these years I have mentioned, 1947, 1948, 1949 and 1950, did you, during any of these times, have any discussions with Mrs. Parr and Mrs. Booth with reference to this business after it was going to be taken out of administratorship? A. Well, the first time— * * * A. Yes.

"Q. You did? Do you recall the approximate date of the first of such discussions? A. On New Year's. It was on New Year's Day at Orange.

"Q. What year? A. 1949.

"Q. 1949? Who was that discussion with? A. Mrs. Parr and Mrs. Booth.

"Q. Both of them? A. Yes, sir.

"Q. All right, will you tell us the nature of it, the substance of what the discussion was? A. Well, I asked them for an option to purchase their interests in the event that either of them died, and I went all over this same thing again with them about what I was doing down there, and that I wanted some protection, and Ruth, she said, 'Well, I don't have anybody but me. I have got it written down in a paper.' I says, 'Well,' and Grace says, the same thing, similar, the same thing: 'I have got it fixed on paper.' I said, 'Yes, that is what you told me about Philip. They never did find the paper. I want it on paper in my hand. I want some assurance, because if anything had happened to either one of you and your papers got lost, or something, then I would get jammed up here with some in-laws or something.' I did not want to be jammed up with any more of them. I had enough of them with Irene.

"Q. All right. Did anything arise out of that discussion you had with them? A. Oh, no, they did not want to do it. They just refused to—they refused to sign them.

"Q. All right. When was the next discussion you had with them regarding their interest in business? A. Well, I talked to them off and on. I could not tell you the date that I—the day of the week or day of the month. Every time we met we did not necessarily talk about options, but they were down there quite often. At times we would discuss them. Then the latter part of '50, in the fall of '50, I told them both that I wasn't going to continue on past the first of the year on the basis that we had been working on. * * *

"Q. But you did tell them you were not going to continue on past the year 1950 under the circumstances you all had been operating down there? Did anything— when was the first time that anything came up with respect to Chevrolet Motors Divi-

sion saying anything with regard to Mrs. Parr and Mrs. Booth having a financial interest in this business? A. Well, the best I can recall on that, was along in '49 and '50.

"Q. All right. Who, of Chevrolet Motors Division, said anything to you about it? A. Well, it was different ones of them discussed it with me.

"Q. Do you recall a discussion at Port Arthur, Mr. Inman, at which Mrs. Parr and Mrs. Booth were present? A. Yes, sir.

"Q. And who, of Chevrolet Motors Division was there? A. Mr. J. R. Roach, Zone Manager, Houston Zone Manager.

"Q. Houston Zone Manager of Chevrolet Motors Division? A. Yes, sir.

"Q. All right. Can you tell us what he stated to them with reference to their interest in this business? A. Well, he told them that—what the policies were of the corporation, Chevrolet Corporation policies were, that they were—under their policy at that time that he explained to them that they had been in there—I think he considered three years was their policy, and he said they had been in there a year or two longer then they should have, and that is when he had this talk with them, that was in 1950.

"Q. 1950? A. Along in the summertime, I think it was, when he was over there.

"Q. Did he explain to them what the policies of the Chevrolet Motors Division was with reference to persons having financial interests in the business, but not actively engaged in the business? A. Oh, yes, he went into that with them, that they did not contribute anything to the operation, and just took money out, and Chevrolet permitted them to be put in the deal in order to try to get them security and get these buildings built back. That was the reason they were ever put in the deal at all, they just—

"Q. All right, sir. Did—then I believe you stated again—it was in the early part of 1950 that you talked to both Mrs. Booth and

Mrs. Parr and stated to them you were not going to continue beyond the year 1950 with the same arrangements down there, is that correct? A. I talked to them in the fall of '50. * * * A. No. I never had any discussions with them about the operation of the business after the fall of '50, until they signed this agreement on March 21 at Ruth's apartment.

"Q. Now, in that connection, Mr. Inman, I show you an instrument here marked Defendant's Exhibit 12, and ask you if that is the instrument you speak of? A. Yes, sir, that is it.

"Q. Now, was that—did you leave that instrument with anybody before it was signed? A. Yes, sir.

"Q. Who did you leave it with? A. Well, I left it with both of them. I left it with both of them at Ruth's.

"Q. At Ruth's apartment? A. Yes, at Ruth's apartment.

"Q. At Mrs. Parr's apartment? A. Yes, sir.

"Mr. Walley: Excuse me, is that the release of administrator he testified to? A. No, I said I never had any discussions with them about the operations of the business until they signed this March 21, 1951.

"Q. Well, with reference to the date, Mr. Inman, was that the same date that the release for the administrator was signed? A. That is the day Mr. Bruce came over there, we went out there to Mrs. Parr's apartment and discussed that at length and they signed it, and we started on this thing.

"Q. I believe that date was March 28 instead of the 21st? A. I think they signed this on March 21, because that is the date they filed the thing, on the 28th, I think that was prior to that.

"Q. Now, what date—at the time you left this instrument at Mrs. Parr's apartment, did you have any discussion with them as to what you were going to do in

the event the instrument was not signed? A. Well, I made them this proposition, it is on that paper there. I told them if they did not agree to that proposition that I was going down to the shop and call Mr. F. C. Mingle, who at that time was Regional Manager at Dallas for Chevrolet, and his office was at Dallas, and tell him I wanted him to find me a buyer, that I was going to get out of this thing, stop, conclude it.

"Q. In other words, you were not going to operate it any further? A. That is right.

"Q. All right, did—was the instrument signed in your presence? A. No, sir.

"Q. Where did you go after you left Mrs. Parr's apartment? A. I went down to the office at the Inman Chevrolet Company.

"Q. In Port Authur? A. Yes, sir.

"Q. Then tell us what happened, Mr. Inman? A. Well, they came down there with it; Grace called up, Mrs. Booth called me up, asked me not to make the call, they would be down there in a few minutes, which they did. They came down in a few minutes, brought it down there signed.

"Q. Was it signed by Mr. Booth at that time? A. Yes, sir.

"Q. And signed by Mrs. Parr? A. Yes, sir.

"Q. And by Mrs. Booth? A. Yes, sir.

"Q. Then I presume—when did you sign it? A. I think I signed it that night, and I think Major Jr. signed it the next day.

"Q. Next day? Now, at—what were you going to do, Mr. Inman, in the event that instrument was not signed by them? * * *

"Q. Then after that instrument was signed, Mr. Inman, did you then continue with the operation of the Inman Chevrolet Company? A. Yes, sir.

"Q. Now, what—in connection with the options mentioned in that instrument you have just looked at, was there any further discussion to be had with respect to a lease agreement? A. We discussed the lease out there that day and we discussed the profits of the business, the previous profits that the business had made, discussed profits it had made up to that time (not up to that date, but up to that time) what it had made in 1951, and we discussed the probable profits that it would have in '51, '52 and '53, and we—as I remember, we talked something about $100,000.00 maybe a year that it might eventually get to at that time, and we arrived at a 20% of the net profits for rent.

"Q. For rent? All right, Mr. Inman, what did you tell them on the occasion of when they brought that instrument to you on the occasion when it was signed with reference to profits for the year 1951? A. Well, at the time that they brought the instrument down there—

"Q. Yes, sir? A. —I did not tell them anything that night. I told them that afternoon.

"Q. That afternoon? A. Yeah, before they signed.

"Q. All right, what did you tell them with respect to the profits being earned by Inman Chevrolet Company during 1951? A. All I could tell them was what we had made in January and February.

"Q. All right, sir. A. Because we don't keep any books down there on a day to day basis.

"Q. Yes, sir. All right. Did you give them that information? A. I am sure that I gave it to them, by months, I could have given it to them lumped together. I don't know what the profit is, now—I don't know what the statement is for '51.

"Q. All right, sir. Were you shortly after that acquainted with the fact that

they secured the services of Mr. Orgain, to advise with them, as to a final conclusion of this agreement? A. Well, I think they had Mr. Orgain— * * * A. I believe they had been going to Mr. Orgain off and on quite a number of times, and I knew that he was their attorney.

"Q. Yes, sir. A. I knew from the conversation with them he was going to draw up this lease, or okay it. We were to write it. We were to write it, Mr. Bruce was to write the lease, which he did, and he took it over there to them to Mr. Orgain, and that did not please them, and Mr. Orgain had him to write another one and that did not please them, and then I told Mr. Bruce, I says, 'Well, just let Mr. Orgain write the next lease and we will have the privilege of approving it.' That is when I consider they broke their word with me, they went in there and let old man Orgain put that 25% in there for rent.

"Q. That is the provision increasing the rent from 20 to 25%? A. That is right. * * *

"Q. Mr. Inman, what I want to ask you is this: Did you ever tell Mr. Orgain that the profits of the Inman Chevrolet Company for the year 1951 were inconsequential? A. No, I never used that word. I never told him anything about the profits of Inman Chevrolet Company.

"Q. Did he ever ask you anything about the profits of Inman Chevrolet Company? A. No, sir.

"Q. Did you ever tell Mrs. Parr that the profits for Inman Chevrolet Company for the year 1951 were inconsequential? A. No, sir.

"Q. Or words to that effect; you say you don't—that is a word you don't use. Did you tell them anything else from which they would get the belief that there was not going to be any profits to amount to anything for 1951? A. Mrs. Booth came down there, as I stated, but Mrs. Parr would come down there on an average of about three times a week and continue that for—I don't know—all the time until after these things were signed. She came down there about 5:30 or a quarter to 6:00, we always closed up at 6:00 o'clock— get to talking and she asked me every time she came down, 'How is business?' 'How are you doing?'

"Q. What did you tell her? A. Well, I would tell her, 'Doing about like we did last year.' 'Maybe not quite as good,' or something. I did not quote dollars and cents to them all the time. * * *

"Q. Did you ever tell Mr. Orgain that you would not exercise that option unless Chevrolet Motors Division made you do it? A. No, sir.

"Q. Did you ever tell Mrs. Booth that you would not exercise that option, or you would not buy them completely out, unless Chevrolet Motors Division made you do it? A. No, sir.

"Q. Did you ever tell Mrs. Booth that you would not exercise that option, or that you would not buy her all of the way out unless Chevrolet Motors Division made you do it? A. No, sir.

"Q. What discussions, if any, did you have with Mrs. Parr with reference to whether Chevrolet Motors Division wanted you to buy out their interests? A. Well, the first discussion about that was Mr. Roach came over there, then afterwards my discussions with them off and on about it."

On cross-examination Mr. Inman testified, in part, as follows:

"Mr. Walley: In the present case Defendant's Exhibit 25, is that the one you say you went over with Mr. Will Orgain? A. Yes, sir.

"Q. Did you talk about any other phase of the transaction? A. Well, the only thing I can remember now about it was, that these girls were making a good deal, and he understood about the deal and all,

he understood the whole transaction, he thought they were getting a good deal; that is all the old man ever told me about.

"Q. And that is all you talked about? A. Well, we talked about these figures on this schedule. He wanted to know about the profit, he wanted to know about the book value, he wanted to know about the withdrawals. He just talked about the various things on this statement.

"Q. Did you talk about any other phase of the transaction? A. Not that I know of.

"Q. Well, could you—could it have slipped your mind at this time? A. Sir?

"Q. Could it have slipped your mind at this time that you did talk about some other phase of the transaction that had already taken place? A. Well, Mr. Walley, I could not tell you verbatim every word that we said.

"Q. I am not asking you verbatim, I am just asking you in substance if you talked about anything else, about these instruments that had been signed, other than the discussion of that exhibit No. 25 there, and his telling you he thought the girls were getting a good deal? A. The only thing Mr. Orgain said about Ruth and Grace, would come up there and stay late and talk and talk to him, I didn't see where he talked about this transaction at all, and they talked to him so much about it, that is about all I can remember about any conversation we had together.

"Q. All right, sir. When did you talk with Mr. Orgain about your change of your intentions to foreclose the girls without waiting for Chevrolet Motors to compel you to do it? A. Well, I don't think I ever told Mr. Orgain any definite time that I was going to exercise these options."

Mrs. Grace Booth, one of the appellees, testified in part, as follows:

"Q. Mrs. Booth, I believe you testified at the time Major Inman Sr. and Mr. Bruce came to Mrs. Parr's apartment for the purpose of having you sign the administrator's release, I believe you were present there at that time, is that right? A. That is right.

"Q. Was anything said to you then concerning Chevrolet Motors' desires about having you and your sister in the business? A. Well, I don't recall about that particular day. It was said to me so many times I presume it must have been said that day, too, that they did not want us in.

"Q. I believe that was along in April or May of 1951, was it not, when they brought the Administrator's release up there? A. Yes, I just don't remember, you know, that exact conversation about that at that time. He had—

"Q. What was said about Chevrolet's desires on that occasion? A. Well, let's see, that was in 1951, was it 1951?

"Q. I believe that is when the administrator's release was. A. That is right, because I remember I left soon after that to go up and get my daughter, she was in school that year, 1951, up in Virginia, there was so much discussion there that day, we went over there about two o'clock in the afternoon and we went over this release of the administrator and talked about all of the things, and Ruth talked about her house, and we talked the option on paper that Major had there, and it had a—oh, I don't know what all it had on there, but in included a section about the leasing, the amount of the rental for the properties, I don't remember what that, the details of that paper were, except that—

"Q. Did Major Inman or Mr. Bruce say anything to you on that occasion about *this* Chevrolet Motors Division wishes in regard to having you in the business? A. Well, I imagine that he did, that particular day I just don't just remember too much about that. I guess I had heard it before so many other times.

"Q. Whether it was said on that day or sometime shortly before then or prior to the signing of the papers on December 26, 1951, what representation was made to you by Major Inman concerning the Chevrolet Motors Division's wishes in regard to having you in the business? A. He did say that they did not want inactive partners, particularly, because we owned the majority percentage of the business and he didn't have the—well, of course, he had the control over it and had the say, and we never interfered with him in any way whatsoever, but he says, 'Oh, they will call down here and want to know something and I will have to run and find you and I'll have to run and find Ruth before I can give them an answer.'

"Well, that was sort of far fetched, because he never had asked either one of us what to do about any of it; and he did just what he wanted to, but anyway, I felt like I was willing to let him have over 50% so he would never have to be embarrassed to that extent, or bothered, whatever you want to call it, but he also said — * * *

"Q. Prior to signing the papers on December 26, 1951, that have been introduced in evidence here, what representations, if any, did Major Inman make to you personally concerning whether or not he would buy out all of your interest out in that business?

"Q. You may answer the question. A. Well, he said the Chevrolet people wanted us to give him an option to buy our interest and that they didn't want to continue the business unless he had that option. He had to have it in order to renew the franchise in October, but that he did not intend to buy us entirely out unless he was made to by the Chevrolet people, and then he added, 'I don't think they will.'

"Q. Did he tell you that on more than one occasion prior to signing the papers on December 26, 1951? A. I certainly think so. I know two—well—three—

"Q. Throughout the negotiations prior to signing the papers December 26, 1951, what representations, if any, did Major Inman Sr. make to you concerning the value of the assets of Inman Chevrolet Company, physical assets? A. He told me a number of times that it was $75,000.00, that all we owned was just the nuts and bolts and it was worth $75,000.00.

"Q. Prior to signing the papers December 26, 1951, during these negotiations, dates have been fixed in March and April, along in there, and up until the end of March, did he ever tell you that the net worth of the business at that time was more than $180,000.00? A. No, he never told me that. He never said it was more than $75,000.00, ever.

"Q. Did he tell you the net worth of that business had increased each month up to where it amounted to more than $265,-000.00 on December 26, 1951? A. No, he did not.

"Q. Was he still, up to that time, leading you to believe that it was $75,000.00, is that right? A. Yes, that is what he said it was.

"Q. Now, during those negotiations and prior to the time they were signed, the papers, on December 26, 1951, did he ever tell you that up through March, 1951 that the net profits earned at the end of March, 1951, amounted to more than $88,000.00? A. I don't remember that he told me.

"Q. Did he ever tell you at any time before the papers were signed on December 26, 1951, that they increased each month to where they amounted to $200,000.00 at the time the instruments were signed December 26, 1951? A. No, he never, he never did.

"Q. I believe you have testified on the contrary, in answer to Mr. Reinstra's questions that he represented to you if he paid you your one-third of the profits he would have to borrow money to do it? A. That is true.

"Q. Mrs. Booth, did you rely on Major Inman Sr. to tell you the truth about what the real worth of that business was? A. I certainly did.

"Q. Did you rely on him to tell the truth about what the net profits were before you signed those papers on December 26, 1951? A. Yes, I relied on him to tell me what I needed to know.

"Q. Did you rely on his statement that the value of the physical assets of that business was not more than $75,000.00? A. I believed him.

"Q. Did you believe him when he told you that unless you signed those papers that the Chevrolet Motors would cancel the franchise? A. Well, I believed what he said and that is what he told me.

"Q. Did you believe him when he told you that he never intended to exercise the option to put you out unless they forced him to? A. Yes, I believed that, because he—

"Q. What was your answer, Mrs. Booth? A. Well, he had told me a number of times that he didn't ever intend to put me out of business.

"Q. Did you rely on that when he told you that? A. I certainly did believe him. His lawyer told me that, too.

"Q. Would you have signed those papers on December 26, 1951 had you known what the true value of that business was, or what the profits were, or had you known his true intentions of putting you out? A. No, I wouldn't * * *

"Q. Mrs. Booth, did you ever have a conversation with Mr. Roach, of the General Motors Corporation, in Port Arthur? A. Yes, I met Mr. Roach in Port Arthur. He requested that Ruth and I have a conference with him one afternoon, which we did. He was over in Beaumont on some other business and came down there to see us.

"Q. What year was that? A. Well, it must have been in 1951, in the fall, I think, of 1951, about—maybe not fall, maybe August, maybe September.

"Q. Could it have been 1950 or was it 1951, according to your recollection? A. Well, I feel sure it was 1951.

"Q. All right. What did he tell you and Mrs. Ruth Parr about the policy of General Motors Corporation with respect to what he would call, what they call 'inactive interests.' A. Well, he did say that they were not making any new deals with inactive partners and that they wanted the manager-owner to have the controlling amount of stock. He never did say that we had to get out at any particular time, or ever. He just said that that was their policy on new deals.

"Q. He told you and Mrs. Ruth Parr both, then, that it was the policy of General Motors, or Chevrolet Motors Division, that inactive interests should not remain in the business, didn't he? A. He said that was their new policy.

"Q. And the whole purpose of him coming down there to talk to you and Mrs. Parr on that occasion was to explain to you that you all would have to get rid of your interests in the business, wasn't it? A. Well, he never did say we had to get rid of all of it. He just said the management—

"Q. I say, he did not talk to you and Mrs. Parr about anything else pertaining to the Chevrolet dealership, did he? A. Well, not in particular that I know of."

From the testimony of Mr. Carl Bernhardt, a certified public accountant in Port Arthur, Jefferson County, the appellees introduced in evidence his opinion as an expert that a new car franchise or dealership in Port Arthur in 1951 did not have a market value, because of the limitations upon the transfer of ownership contained in the dealers' franchise agreement with the Chevrolet Division of General Motors Corporation. It was Mr. Bernhardt's opinion also that the Inman Chevrolet Company in Port Arthur had a real or intrinsic

value on December 26, 1951, and that such value was $1,588,995.06.

The appellant M. G. Inman, Sr. testified by deposition that after the close of the administration of the estate of Philip Inman, deceased, the business of Inman Chevrolet Company was operated as an informal three-way partnership of himself and his two sisters, with no written agreement of partnership. On December 26, 1951 a written partnership agreement between M. G. Inman, Sr., M. G. Inman, Jr., and Mrs. Parr and Mrs. Booth, effective January 1, 1951, was executed at the time the other instruments involved in this suit were executed.

The appellee, Ruth Parr, in her fourth amended original petition, upon which the case was tried, alleged as a ground of fraud on the part of M. G. Inman, Sr. in securing the execution by her of the instruments executed on December 26, 1951, that by reason of his relationship to her as her brother, as her partner, as the exclusive managing partner of the partnership in which she was wholly inactive, and further by reason of the fact that during the negotiations for the execution of such agreement it was his intention to get rid of her as a partner, there was imposed upon him the very high legal and equitable duty to reveal to her during such negotiations all facts within his knowledge material to the valuation of said business sought to be acquired by him from her and not to misinform her as to any fact or facts relating to said business material to the valuation thereof or her interest there; she further alleged that at the beginning of such negotiations the net worth of the business of Inman Chevrolet Company was more than $180,000 and said net worth continued to increase during said negotiations, and that on December 26, 1951 the net worth of said business exceeded $265,000 and the value of her one-third interest therein exceeded $88,-000; that said M. G. Inman, Sr. was in possession of such information because of the monthly reports he was required to make and that that he wholly failed to give such information to her during such negotiations; that on divers occasions during said negotiations M. G. Inman, Sr. falsely and fraudulently represented to her and to the attorney representing her that the maximum value of the assets of Inman Chevrolet Company during such time was not more than $75,000 and that she executed said instruments in reliance upon said representations; she further alleged that the appellant M. G. Inman, Sr. and his agent and attorney, Graham Bruce, represented to her attorney, Will E. Orgain, in substance that the profits earned by Inman Chevrolet Company during 1951 were inconsequential and that the instruments assigning 8⅓ per cent interest in the business to appellant M. G. Inman, Jr., retroactive to January 1, 1951 would not result in any appreciable financial loss to her, and that such representations were false at the time of making, in that such profits amounted to more than $150,000, and that she and her attorney relied on such representations. She further alleged that appellant M. G. Inman, Sr., while negotiating with her, to induce her to sign the instruments complained of, falsely represented to her that unless she and her sister Mrs. Booth, should execute such agreements the Chevrolet sales franchise to Inman Chevrolet Company would not be renewed and that accordingly the partnership would lose the very profitable and highly valuable dealership; that she relied upon such representations. She further alleged that appellant M. G. Inman, Sr. falsely represented to her and to her attorney during said negotiations that it was necessary for her to execute the option to said appellant to purchase the remaining 20 per cent of her interest in said business after December 31, 1952 in order to prevent loss of said Chevrolet franchise, but that the appellant had no intention of exercising said option and further that he would not exercise said option unless he should be required to do so by the Chevrolet Division, when in truth and in fact he intended at that time to get her into a position to oust her completely as a partner without regard to compulsion on

the part of the Chevrolet Division's agents; that such representations as to his intentions were false and that she relied upon them.

Appellee Booth, in substance, alleged the same matters as fraudulent acts and representations on the part of appellant M. G. Inman, Sr.

The appellants in their answer and cross action on which the case was tried, denied generally all the allegations of the appellees and also specially denied any partnership between the partners except that one provided for in the written agreement executed December 26, 1951, and also specially denied that they were guilty of any fraudulent conduct as alleged and withheld no information to which the appellees were entitled, and alleged that during all negotiations the appellees had the benefit of competent legal counsel of their own choosing. They further alleged that appellees Parr and Booth agreed with appellant M. G. Inman, Sr. on May 3, 1947, at the time of the execution of the agreement between the heirs at law of Philip Inman, deceased, that if M. G. Inman, Sr. did obtain the selling agreement from Chevrolet Motors Division of General Motors Corporation and would operate the Inman Chevrolet Company, devoting thereto his skill, ability and time, and would pay from the profits thereof the indebtedness assumed by the parties in an agreement of May 3, 1947 and re-build the building which had been destroyed by fire and permit both the appellees to participate in the earnings and profits of said business until said building was re-built and all the indebtedness due under said agreement was discharged then they would give and release to him the physical assets of Inman Chevrolet Company as compensation for his time, efforts and business ability and skill devoted to the operation of said business; that he relying on such representations and promises, obtained said selling agreement or franchise and actively operated and conducted the business, earning considerable profits therefrom which were applied to the payment of the in-

debtedness assumed by said parties in the agreement of May 3, 1947, and applied to the reconstruction of the building to house the business of Inman Chevrolet Company, and all profits and earnings above such payments were accounted for by him and a proportionate share thereof paid to appellees Parr and Booth; that during the course of the operation of the business from May 20, 1947 to December 31, 1950, the appellees contributed nothing except their original interest obtained by them in the death of Philip Inman toward the operation of said business, and the successful operation of said business occurred solely through the time, effort, work, skill and ability of M. G. Inman, Sr. They further alleged that the selling agreement or franchise from Chevrolet Motors Division of May 20, 1947 and of subsequent such selling agreements were obtained upon the reliance and recognition of M. G. Inman, Sr. as the active manager and operator of said business and such selling agreement would not and could not have been obtained except upon the skill and ability of appellant M. G. Inman, Sr. in the selling of automobiles. They further alleged that M. G. Inman, Sr. would not have entered into the operation of said business and carried out the operation during said time had it not been for the promises and representations on the part of appellees Parr and Booth as set out above. They alleged that the execution of the written instruments sought to be cancelled was made pursuant to said representations and promises made by appellees Parr and Booth. They further alleged that the suit of the appellees and their demand therein was stale and subject to laches, and that appellee Parr knew in January of 1953 every fact and circumstance of which she complained in her petition and that she thereafter waited an unreasonable length of time before making any attack upon said written instruments; and that during such time the position of the appellants had greatly changed all to their injury. They further pleaded estoppel and alleged that appellee Parr after having full knowledge of all the

matters about which she complained in her suit accepted the fruits and benefits of the instruments she seeks to set aside and cancel in that she accepted the money due her under the option agreement, except the amount tendered her for her remaining 20 per cent, accepted profits earned from the continuance of said business and accepted rental payments made under the terms of the lease contract she now seeks to set aside and have cancelled. They further alleged that the appelleees ratified such instruments by the execution and delivery of bills of sale and letters referring to said instruments.

The appellants also pleaded the two-year and four-year statutes of limitation against the appellee Booth and also pleaded the ratification of the instruments sought to be cancelled.

The jury found in anwer to special issues that; (1) from March, 1951 to December 26, 1951, M. G. Inman, Sr. was in possession of substantially correct information as to the net worth of Inman Chevrolet Company to the end of each month during such period; (2) that such information was material to the valuation of appellee Parr's interest in the personal property and other assets of Inman Chevrolet Company during said period; (3) that M. G. Inman, Sr. failed to give such material information to appellee Parr during said period; (4) that during said period M. G. Inman, Sr. was in possession of substantially correct information as to the net profits earned by Inman Chevrolet Company to the end of each month during such period; (5) that such information was material to the valuation of appellee Parr's interest in the personal property and other assets of Inman Chevrolet Company during such period; (6) that M. G. Inman, Sr. failed to give such information to appellee Parr during said period; (7) that during said period M. G. Inman, Sr. represented to appellee Parr that the net value of assets and property of Inman Chevrolet Company would not exceed $75,000 and (8) that such representation was false; (9) that appellee Parr relied upon said false representations in executing the instruments of December 26, 1951; (10) that during said period M. G. Inman, Sr. represented to appellee's attorney Orgain in substance that the profits being earned by Inman Chevrolet Company during 1951 were inconsequential; (11) that said representations at the time they were made were false; (12) that appellee Parr relied upon said representations in executing the instruments of December 26, 1951; (13) during said period M. G. Inman, Sr. represented to appellee Parr that unless she agreed to the terms of the instruments in suit Chevrolet Motors Division of General Motors Corporation would cancel the sales contract and would not renew the same; (14) such representation was not false; (16) that during such period of time M. G. Inman, Sr. represented to appellee Parr that he did not intend to exercise the option to purchase her remaining 20 per cent interest in Inman Chevrolet Company after December 31, 1952 unless he should be required to do so by Chevrolet Motors Division of General Motors Corporation; (17) that such representation of his intention was false; (18) that appellee Parr relied upon said false representation in executing the instruments; (19) that the value of appellee Parr's interest in the personal property and other assets of Inman Chevrolet Company on December 26, 1951 had a substantially greater value than the sums paid and to be paid to her under the terms of the instruments in suit; (20) that the information which appellant M. G. Inman, Sr. had relating to the net worth of Inman Chevrolet Company was material to the valuation of the interest of appellee Booth in the personal property and assets of Inman Chevrolet Company; (21) that M. G. Inman, Sr. failed to give such information to appellee Booth during the said period and (22) that such information was material to the valuation of the interest of appellee Booth in the Inman Chevrolet Company; (23) that M. G. Inman, Sr. failed to give such information to appellee Booth; (24) M. G. Inman, Sr. represented to appellee Grace Booth that the net value of the assets and property of Inman Chevrolet

Company did not exceed $75,000; (25) such representation was false; (26) appellee Booth relied on said false representation in executing the instruments; (27) during such period M. G. Inman, Sr. represented to appellee Booth's attorney, Will E. Orgain, that the profits being earned by Inman Chevrolet Company during 1951 were inconsequential; (28) such representation was false; (29) appellee Grace Booth relied on said representation; (30) during said period of time M. G. Inman, Sr. represented to appellee Grace Booth that unless she agreed to the terms of the instruments in question Chevrolet Motors Division would cancel the sales contract and would not renew the same; (31) such representation was not false; (33) during said period M. G. Inman, Sr. represented to appellee Grace Booth that he did not intend to exercise the option to purchase her remaining interest in Inman Chevrolet Company after December 31, 1942 unless required to do so by Chevrolet Motors Division; (34) at the time of making such representation of his intention such representation was false; (35) appellee Grace Booth relied on said representation; (36) the value of appellee Grace Booth's interest in Inman Chevrolet Company on December 26, 1951 had a substantially greater value than the sums paid and to be paid to her under the instruments of December 26, 1951; (37) that the appellees Booth and Parr on May 3, 1947 did not agree to the proposal of M. G. Inman, Sr. that if he would obtain a franchise from Chevrolet Motors Division and operate the Inman Chevrolet Company and from the profits pay the indebtedness assumed by the parties in the May, 1947, agreement and rebuild the building destroyed by fire and account to them for one-third of the profits of the business the appellees Parr and Booth would release to M. G. Inman, Sr. the physical assets of Inman Chevrolet Company; (46) on March 15, 1952 Grace Booth had knowledge of the 1951 profits of Inman Chevrolet Company; (47) subsequent thereto Grace Booth ratified the instruments of December 26, 1951; (48) that on or about March 15, 1952 Ruth Parr had knowledge of the 1951 profits of Inman Chevrolet Company; (49) subsequent thereto Ruth Parr ratified the instruments of December 26, 1951; (50) on January 15, 1953 appellee Ruth Parr knew that M. G. Inman's representation of his intention was false; (51) Ruth Parr did not wait an unreasonable length of time in filing her suit; (52) on December 26, 1951 appellee Parr's one-third interest in Inman Chevrolet Company, which was the subject of the instruments executed December 26, 1951 did not have a reasonable cash market value in Jefferson County, Texas; (53) the sum of $100,000 if paid now in cash would reasonably compensate appellee Parr for the loss sustained by her by reason of the execution of the instruments of December 26, 1951.

Appellants bring their appeal under 134 points of error. In their brief the appellants present these various points in groups. Their first 23 points present their complaint of the action of the trial court in overruling their motions for instructed verdict against both appellees. They are presented in several groups but we shall consider all such first 23 points together. Their points 25 through 88 and 106 through 134 are directed at the action of the trial court in overruling objections to the court's charge and the various issues submitted in the court's charge. By the remaining points, the appellants attack admissibility of certain evidence received by the trial court over their objections and complain of the court's refusal to strike such testimony from the record, the trial court's refusal to set aside the jury's answers to various special issues, and objections to the entry of the judgment for the reasons advanced under such points. A great many of the appellants' points of error, other than the first 23 points, are related to and based upon the contentions advanced by them in such 24 points of error and the determination of the first 24 points would also dispose of a great many such other remaining points.

We first consider the appellants' contention that their motions for instructed ver-

dict should have been granted. Under such points they contend that such motions should have been granted, because the undisputed evidence shows that appellees' reliance with reference to the matter complained of was upon the advice and counsel of their attorney and not upon any representations made by appellants; because the undisputed evidence shows that the sole reason and inducement for the execution of the instruments in controversy was their attorney's advice that if the instruments were not executed appellant M. G. Inman, Sr. would cancel the selling agreement of Inman Chevrolet Company and dissolve the partnership and in that event the profit making possibilities with the Inman Chevrolet Company would be destroyed; because as a matter of law appellees could not have relied upon any representations made by M. G. Inman, Sr. in the absence of any evidence that the selling agreement of Inman Chevrolet Company (which was terminable according to its provisions and necessary to be renewed from year to year) would not have been cancelled or would have been renewed in the event they did not execute the instruments in controversy; because as a matter of law they could not have relied upon the representations of M. G. Inman, Sr. that he would not buy out all of their interests in Inman Chevrolet Company in the face of their attorney's advice to them that if they signed the option contracts the appellants would have the legal right to exercise such options according to their terms; because the appellees would in no event be entitled to set aside or cancel the instruments in controversy nor to recover any damages predicated thereon, since the undisputed evidence showed that they executed the instruments designated "defendants' exhibit No. 12" for the purpose of inducing M. G. Inman, Sr. not to cancel the selling agreement with the Chevrolet Motors Division, and such instruments being in substantially the same terms as the option agreements executed by them on December 26, 1951; because the undisputed evidence showed that appellee Ruth Parr fully understood that the instru-

ments in controversy were to be effective according to the terms of such instruments and that she was not to participate in the 1951 profits of Inman Chevrolet Company except to the extent of 25 per cent thereof, and as a matter of law the alleged representations and non-disclosure on the part of Inman, Sr. could not have induced the execution of said instruments; because there was no competent evidence to show any failure on the part of appellant Inman, Sr. to disclose to Ruth Parr or to her attorney the material facts in connection with the execution of the instruments in controversy; because the undisputed evidence showed that the operation of Inman Chevrolet Company was pursuant to a selling agreement personal to M. G. Inman, Sr. in which Ruth Parr had no interest and that her sole investment in said Inman Chevrolet Company was the working capital she owned therein, she is in no event entitled to relief by way or recision or cancellation, and her sole measure of recovery would be the value of such working capital at the time of the effective date of the instruments executed on December 26, 1951; because there was no evidence to show that Chevrolet Motors Division did not require appellant Inman, Sr. to purchase Ruth Parr's remaining interest in Inman Chevrolet Company, and there was no evidence to show that the alleged representation made by Inman, Sr. in such regard was false; because there was no evidence to show that Chevrolet Motors Division did not require appellant Inman, Sr. to purchase Grace Booth's remaining interest in Inman Chevrolet Company and there was no evidence to show that the alleged representation made by appellant Inman, Sr. in such regard was false; because under the undisputed evidence appellants were entitled to a decree for specific performance upon their cross action against both Ruth Parr and Grace Booth; because the undisputed evidence showed that in January, 1953, the appellee Ruth Parr knew of every fact and circumstance of which she complained in her suit and that she as a matter of law is estopped to assert her demands and causes of action,

in that she has accepted the benefits of the instruments which she seeks to rescind and cancel and filed no suit with reference thereto until January 3, 1955, during which time the financial and legal position of the appellants has been materially altered and said appellants cannot be placed in the same position they occupied at the time of the execution of said instruments on December 26, 1951; because the undisputed evidence showed that in January, 1953, Grace Booth knew of every fact and circumstance of which she now complains and is as a matter of law estopped to assert her alleged defenses in that she has accepted the benefits of the instruments which she executed and sought no relief therefrom until long after this suit was filed on January 3, 1955, during which time the financial and legal position of the appellants has been materially altered and said appellants cannot now be placed in the same position they occupied at the time of the execution of said instruments on December 26, 1951; because the undisputed evidence showed that in January, 1953, the appellees knew of every fact and circumstance of which they now complain, and their claims for relief are, as a matter of law, stale and subject to the doctrine of laches; because the undisputed evidence showed as a matter of law that no partnership agreement other than the one executed on December 26, 1951 was ever entered into between the parties after the business of Inman Chevrolet Company was taken out of "administratorship".

From the above contentions of the appellants and from their opening statement in their brief, it is seen that basically the position of the appellants is that no fraud was shown, that the parties all understood and agreed that the effective date of the instruments executed on December 26, 1951 (except the lease agreement) was to be January 1, 1951 and that, therefore, the matter of the 1951 net worth and profits were immaterial to this controversy; that the alleged frauds were not an inducing factor in the execution of the instruments in controversy; and that in any event, since the selling agreement with Chevrolet Motors Division was personal to Inman, Sr., and since he was under no legal obligation to continue the business of Inman Chevrolet Company, the sole measure of recovery by Ruth Parr and Grace Booth would be the value of their interests in Inman Chevrolet Company of January 1, 1951, the effective date of the instruments executed December 26, 1951. They argue that the sole inducement on the part of Ruth Parr and Grace Booth to the execution of the instruments in controversy was the statement of M. G. Inman, Sr. that he would not continue to operate the business after it was taken out of administration unless the appellees gave him options whereby he could eventually acquire their entire interests in the assets of such business, and that the alleged fraudulent representations relied upon by appellees were not a material inducing factor toward the execution of said instruments. They say that despite the testimony of both Ruth Parr and Grace Booth that they would not have executed such instruments except for the alleged fraudulent representations and non-disclosure on the part of M. G. Inman, Sr., the evidence is conclusive that the sole inducement to the execution of said instruments was to forestall asserted action on the part of Inman, Sr. to terminate the relationship existing between the parties and cancel the selling agreement between M. G. Inman, Sr. and Chevrolet Motors Division. They argue that it is obvious that any representations made by Inman, Sr. could not as a matter of law have been relied upon by the appellees in the absence of some showing that the business of Inman Chevrolet Company would not have continued if they declined or refused to execute the instruments in controversy and that all parties, including appellees and their attorney, Mr. Orgain, understood that the business was going to be shut down unless the appellees agreed to the proposal of M. G. Inman, Sr., whereby he would acquire their interests in the business. They say that the compelling factor motivating appellees in executing the instruments in contro-

versy was to keep Inman Chevrolet Company in operation as a going concern so they could participate as long as possible in the profits, and said instruments were not executed as a matter of law upon reliance on any representation made by M. G. Inman, Sr.

 We are unable to agree with the appellants that the trial court erred in overruling their motions for instructed verdict. We have set out in the opening statement above, an unusually lengthy and detailed statement of the testimony of the four parties who participated in the negotiations which led to the execution of the instruments now under attack on December 26, 1951. We believe that it was necessary to do so in order to gain a completely accurate view of all surrounding facts and circumstances which entered into the execution of such instruments. From them it is observed that appellant M. G. Inman, Sr. occupied with respect to the appellees, his sisters, a position of trust and confidence. He was the managing partner in exclusive control and management of all the business affairs of Inman Chevrolet Company. This was true during all the period of administration, and also during the period of time from the closing of administration until the date of execution of the instruments under attack. While it is undoubtedly true that he was under no obligation to continue to operate the business for the benefit of all three of them, when he decided that he must be permitted to purchase a portion of their interests in the business at once and eventually to purchase all their remaining interests in the business, nevertheless he owed them the highest duty to make a full and correct disclosure to them of all facts in his possession, of which his sisters should have knowledge in arriving at a decision and agreement to sell him such interests at the price proposed. The average profit per month and the accrued profits for the year and the net worth of the business at the time the deal was made was certainly of the greatest importance

to them in deciding whether the price which he offered was adequate. M. G. Inman, Sr. apparently was honestly under the belief during all of these negotiations that in his purchase and securing of options to purchase the interests of his two sisters in the business, he was buying and they were selling only the physical assets of the business. He appears to have been honestly under the belief that this was true and that such assets, after the disbursement of profits and the deduction of liabilities, should be based upon the value of the business of $75,000. In this assumption and belief, we believe he was in error. The bare physical assets, "just the nuts and bolts", were not all that he secured when he purchased their interests. He got not only the appellees' share of the physical assets of the business but also full ownership, for himself and his son, of a going concern which had been in business at the same location for more than 25 years and which could be operated under the same firm name under which the business had been built up. His representations to the appellees and their attorney as to earnings and worth, and his non-disclosure of such matters, may not have been, and in all probability were not, the principal factor which brought about the decision of the appellees to sell to him but they undoubtedly did contribute the principal activating cause of their agreement to make the sale for a price of $25,000 to be paid to each of them. The falseness of his representations, as alleged and testified to, that he had no intention of exercising his option to purchase the final 20% interest in the business unless Chevrolet Division of General Motors Corporation required him to do so, are in keeping with the allegations and other testimony of the appellees, and with M. G. Inman's own testimony, that he was tired of doing all the work in the business and receiving only one-third of the profits. The fact of reliance by the appellees on such a representation not to exercise the options unless compelled to do so by Chevrolet Di-

vision, and the testimony itself as to the making of such representations, were not attempts to vary by oral testimony the provisions of a written contract. If he made such a representation to them or their attorney and at the time of making it intended to exercise the options as soon as the terms of the options permitted him, regardless of whether Chevrolet Division compelled him to do so, it would be a false representation as to an existing material fact. A person's state of mind has been held to be a fact, as much so as the state of health of his body. This was properly allowed by the trial court to show fraud entered into the making of the contract, and not to alter the contract made. Whitcomb v. Moody, Tex.Civ.App., 49 S.W.2d 513.

■■ It appears to us that there is no question but that during the negotiations between the parties in 1951 the Inman Chevrolet Company was a partnership equally owned by M. G. Inman, Sr., Ruth I. Parr and Grace I. Booth. The partnership instrument signed by the parties December 26, 1951 so recited and M. G. Inman, Sr. so testified. In his capacity as sole managing partner of the business he owed to the appellees the highest duty of honesty and fair dealing in making the trade to buy their interests. Indeed, it was not necessary that the appellees show in the trial that they relied upon M. G. Inman, Sr. to make disclosure of all the material information in his possession about the financial condition of the business. Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720; Koppe v. Koppe, 57 Tex.Civ.App. 204, 122 S.W. 68; Pridham v. Weddington, 74 Tex. 354, 12 S.W. 49; Warner v. Winn, 145 Tex. 302, 197 S.W.2d 338; Schiller v. Elick, 150 Tex. 363, 240 S.W.2d 997; Smith v. Bolin, 153 Tex. 486, 271 S.W.2d 93.

■ From the statement of the case above, and the evidence quoted above, we are satisfied that the appellee Ruth Parr sought legal advice within such a reasonable time after she learned that M. G. Inman, Sr. decided to exercise his option in January, 1953, that her complaints and cause of action are not barred by the doctrine of laches and stale demand. She consulted four different lawyers before she retained the services of her counsel in this case. As to the appellee Grace Booth, her position in this case from its inception has been that of a defendant. She did not institute any proceedings, and had asked no affirmative relief such as cancellation and recision of the contract, or for damages, for fraud. She has merely asked that the appellants' prayer for specific performance of the contract or option to sell be denied. She is in a very strong position in this case and she could not be required to assert her defensive remedies until suit was brought against her for specific performance and damages.

It follows that we believe that the pleadings and the evidence made out a case for the appellees which the trial court was compelled to submit to the jury, and that the motions for instructed verdict were properly overruled.

Points Nos. 24 to 49, inclusive, present the appellants' complaints of the trial court's action in overruling certain of their objections to the court's charge. These points are overruled, for the reason that they, in our opinion, are based upon the appellants' basic defense in the case as outlined in their motions for instructed verdict. We are not going to set them out in detail nor discuss them one by one, although we have read them through and considered them carefully, together with the arguments supporting such points in appellants' brief. We believe they present no error. For instance, points Nos. 24 and 25, 28 and 29, are based upon the contention of the appellants that the net worth of Inman Chevrolet Company subsequent to March, 1951, would not be material in view of the fact that the effective dates of the instruments in controversy were January 1, 1951. In holding above that the motions for instructed verdict

were properly overruled, we indicated our disagreement with this proposition for the reasons given. The remainder of such points likewise present matters based on matters of substantive law which are discussed above.

■ Points Nos. 50 and 51 present objections to Special Issues Nos. 17 and 34 of the court's charge. These issues presented to the jury the question whether M. G. Inman's representation, if any, that he did not intend to exercise the options unless required to do so by Chevrolet Motors Division was false. They say that neither of said issues nor the charge as a whole submitted to the jury the ultimate issue as to whether Chevrolet Motors Division required M. G. Inman to purchase Ruth Parr's and Grace Booth's remaining 20% in Inman Chevrolet Company. We see no reason why the question whether Chevrolet Motors Division, in January, 1953, required M. G. Inman, Sr. to purchase appellees' remaining interests in the business could have any bearing on M. G. Inman's intentions on the option matter during the negotiations which culminated December 26, 1951. Appellees' contention was that M. G. Inman, Sr. did make such representations of his intention not to buy their interests in the business unless compelled to do so by Chevrolet Motors Division, and that at the time of making, this was not true and that they relied upon such false representation of his intention at the time they signed the instruments in December, 1951. Whether Chevrolet Motors Division actually did compel him to exercise his option at the earliest date the option itself permitted him to do so was not a necessary part of the issues submitted.

Points Nos. 52 to 59, inclusive, all present objections to the same special issues in the charge as were considered immediately above in Special Issues Nos. 17 and 34. They say that such issues did not restrict the jury to any specific time as to when such representation was false. This is obviously erroneous, since both of said issues fix such time by their own wording, "at the time of making such representation." Under these points the appellants again assert that the ultimate issue was whether Chevrolet Motors Division required M. G. Inman, Sr., to purchase the remaining 20% interests of the appellees. They also contend that such issues should have contained the submission whether an ordinary prudent person in the same or similar situation as was appellant would have in good faith believed that Chevrolet Motors Division was compelling him to buy out the remaining 20% interests of the appellees. We do not believe that these elements of fact were required to be included in such issues. In addition, we have labored through three volumes of the statement of facts and have copied a large part of it in the statement in this opinion above, and we find no evidence which raises the issue whether M. G. Inman, Sr., actually believed the Chevrolet Motors Division required him to exercise the option when he did, or that he in good faith believed that they did.

Points Nos. 60 to 65, inclusive, all present objections to the court's charge, in which the appellants again set out their contentions that the appellees were under the burden on the trial of showing that they believed the representations of M. G. Inman, Sr.; that any representations made after January 1, 1951, were immaterial; that the issues do not contain the question whether the appellees relied upon the representations. The special issues complained of were not subject to the objections made and these points are overruled.

■ Points Nos. 66 to 71, inclusive, present the appellants' objections to Special Issues Nos. 19 and 36 of the court's charge. Special Issue No. 19 inquired of the jury whether the value of appellee Parr's interest in the personal property and other assets of Inman Chevrolet Company on December 26, 1951, had a substantially greater value then the sum paid and to be paid to her by appellants therefor under the terms of the instruments executed on December 26, 1951. Special Issue No. 36 made the same inquiry

as to the value of Grace Booth's interest in the personal property and other assets of Inman Chevrolet Company.

Appellants made the objection that neither said issues nor the court's charge as a whole limited the jury in ascertaining the net value of plaintiff's and cross defendant's interests, excluding the liabilities that may be properly chargeable against such interests.

Under points 67 and 70, appellants say in their brief that since the trial court gave the jury no guide to assist them in answering said issues, and since the interests of the appellees in the personal property and other assets of Inman Chevrolet Company should be chargeable to their pro rata responsibility for liabilities owing by Inman. Chevrolet Company at the time inquired about, the court made an error in overruling said objections. We disagree. Any person of ordinary intelligence knows that the value of a business is the value of that business after its debts and liabilities are discharged. The jury had in evidence before it several auditor's statements of the financial condition of the Inman Chevrolet Company at various times and particularly had in evidence the report of the auditor appointed by the trial court. The latter report shows, among other things, the balance sheet of Inman Chevrolet Company as of December 31, 1951, five days after the date of execution of the instruments. Such balance sheet reflects the total assets of over $321,000 and liabilities $51,738.83. Such balance sheet shows, after allowing the said sum for liabilities the further allowance and deduction of $3,692.33 reserved for future expenses, the net worth of Inman Chevrolet Company on December 31, 1951, was $265,886.56.

The other auditors' reports in evidence showed a balance sheet reflecting a net worth after the deduction of liabilities. With the above evidence in the record, we find no harm in the omission of the trial court of some phraseology indicating that the value of the appellees' interests in the assets and personal property of Inman Chevrolet Company was the net value after the deduction of liabilities. If this was error, which we doubt, it was harmless error and not ground for reversal.

■ Points Nos. 68, 69 and 71 are not briefed by the appellants. We must consider them as waived and overrule them without discussion.

■ Appellants points Nos. 72 to 76, inclusive, all complain of the court's submission of Special Issue No. 52. This was the issue which inquired whether the one-third interest of Ruth Parr in Inman Chevrolet Company, which was the subject of the bill of sale and the options to appellants, executed December 26, 1951, did not have a reasonable cash market value in Jefferson County, Texas, on December 26, 1951. By these objections the appellants say that said issue was wholly improper, the correct inquiry being whether Inman Chevrolet Company did not have a reasonable cash market value on December 26, 1951; because as said issue is worded the jury could conclude that the one-third interest of Ruth Parr did not have a reasonable cash market value and yet be of the opinion and find that the business and assets of Inman Chevrolet Company as a whole did have a reasonable cash market value on said date; because it being the theory of Ruth Parr that Inman Chevrolet Company, prior to December 26, 1951, was a partnership in which she owned a one-third interest, and it being the law that one partner could not sell his interest in the partnership without consent of the other partners, the jury could conclude that Ruth Parr's one-third interest had no reasonable cash market value even though they believed from the evidence that the entire business and assets of Inman Chevrolet Company did have such a reasonable cash market value; that since the effective dates on the instruments in question were January 1, 1951, the proper inquiry as to whether Ruth Parr's interest did not have a reasonable cash market value should have been confined to the date of January 1, 1951, rather than December 26, 1951. For the reasons stated above, we

have held that December 26, 1951 was a date pertinent to all the inquiries, statements and representations of the negotiations between the parties. We have also held that the business of Inman Chevrolet Company was being operated from January 1, 1951 to December 26, 1951 as a partnership under an informal, unwritten agreement of the parties. The selling agreement or franchise from Chevrolet Motors Division to Inman Chevrolet Company, with M. G. Inman, Sr., as the managing partner, was in evidence and by its terms the sale of any portion of or interest in Inman Chevrolet Company as a retail outlet for Chevrolet automobiles was limited very strictly, in fact was prohibited without the consent of Chevrolet Motors Division. The Inman Chevrolet Company therefore, as a matter of law, had no cash market value, as that term is almost universally defined in law. It would have been useless to submit an issue to the jury inquiring whether the assets and property of Inman Chevrolet Company had a cash market value at that time and place. The issue itself was probably unnecessary under these facts, since for the same reasons the one-third interest of Ruth Parr could not be sold without the approval of Chevrolet Motors Division. The submission of the issue and the jury's answer "It did not" did no harm to the appellants. These points present no error and they are overruled.

Appellants' points Nos. 77 to 87, inclusive, all complain of Special Issue No. 53 and the trial court's action in overruling their objections thereto. By this special issue the court inquired of the jury, "What sum of money, if any, if paid now in cash, would reasonably compensate Ruth Parr for the loss, if any, sustained by her by reason of her execution of the instruments in question signed by her on December 26, 1951?" In connection with this issue the court gave the following instruction: "In answering the foregoing Special Issue, you may take into consideration only the intrinsic value, if any, of the interests of Plaintiff in the Inman Chevrolet Company involved in said instruments on the date in question, subtracting therefrom the sums provided to be paid to her under the terms of said instruments.

"By the term 'intrinsic value' is meant the true, inherent and essential value, independent of accident, place or person, which value is the same everywhere and to every-one."

Under these points they say that the issue was upon the weight of the evidence in that it informed and instructed the jury that the appellants should pay some damages to appellee Ruth Parr and assumed that she had sustained pecuniary damages by virtue of her executing the instruments in question; that said issue did not restrict the jury in answering it to a consideration only of the loss sustained by her proximately flowing or resulting from the wrongful conduct, if any, of the appellants; that said issue was upon the weight of the evidence in assuming that the appellants wrongfully caused appellee to execute the instruments in question, and thereby causing her to suffer a loss; that the instructions given in connection with the issue did not advise the jury as to the nature of appellee Parr's interest therein mentioned, that is, whether her interests were of capital nature only, whether in physical assets, and whether her interests were to be considered before or after charging the same with outstanding liabilities of Inman Chevrolet Company, because that issue and the instructions in connection therewith permitted Ruth Parr to recover for losses which were not and could not be anticipated by the parties at the time of the transactions; that said issue and instructions in connection therewith permitted appellee Ruth Parr to recover upon an improper measure of damages, in that her legal measure of recovery, if any, was the difference between the value which she received and the value of that with which she parted; that said issue and instructions in connection therewith permitted Ruth Parr to recover upon an element of good will of Inman Chevrolet Company, which did not in fact and in law exist by reason of the terms of the franchise under which Inman Chevrolet Company was be-

ing operated; that said issue and instructions given permitted the jury to make a finding thereon without taking into consideration that shortly after January 1, 1952 appellee Ruth Parr withdrew from Inman Chevrolet Company substantial profits earned during 1951; that said issue and instructions given were confusing and calculated to cause the jury to bring in an improper answer, because it required the jurors to perform the functions of an accountant, in a specialized field of bookkeeping and accounting; because there was no competent evidence from which the jury could find the intrinsic value of Ruth Parr's interest in Inman Chevrolet Company nor Inman Chevrolet Company as a whole.

We overrule these objections. Said issue is not upon the weight of the evidence. It does not inform or instruct the jury that they should pay damages to the appellee or pay anybody anything; it does not assume that appellee had sustained any damages but asks in perfectly good legal jargon what sum of money, if any, would compensate her for the loss she sustained by reason of her execution of the December 26, 1951 instruments, if she did sustain such a loss. Neither do we believe that it was upon the weight of the evidence or assumed that the appellants wrongfully caused appellee to execute the instruments in question and thereby caused her to suffer a loss. The question of wrongful causation does not appear in the issue. The omission of any idea of loss proximately flowing or resulting by wrongful conduct, if any, of the appellants was properly omitted from the issue by the court, as we see it. The matter of wrongful conduct was submitted in other issues, and the question of whether the appellee Ruth Parr suffered any damage proximately flowing or resulting therefrom was a matter properly to be decided by the trial court in rendering judgment on the verdict of the jury and undisputed evidence in the case. The complaints under these points which are directed at the lack of testimony in regard to intrinsic value are overruled for reasons given in our discussion below of the admissibility and sufficiency of the tes-

timony and evidence of the witness Bernhardt. Under these points the appellants again present their contention that since M. G. Inman, Sr. could terminate the Chevrolet franchise on one month's written notice for any cause and the Chevrolet Motors Division could terminate it for any cause, and since M. G. Inman, Sr. had definitely declined in 1951 to continue the operation of Inman Chevrolet Company as it was being operated and was on the verge of cancelling the current franchise or selling agreement if the appellees did not sign the bills of sale and option agreements he obtained, and since in that event the only value of the business would be the physical assets on hand, then, because of all these facts what M. G. Inman, Sr. bought from appellees was the physical assets of the business on hand. We regard this as a contention that such Issue No. 53 should have limited the jury in its determination of the intrinsic value of Ruth Parr's one-third interest in Inman Chevrolet Company to the intrinsic value of the physical assets only of Inman Chevrolet Company, *as they would have been if the Chevrolet Motors Division franchise had already been cancelled* and the business as a going concern had come to an end. As we have indicated above, we do not agree with this contention. We view the transaction as a sale from Ruth Parr to M. G. Inman, Sr. and his son of a one-third interest in all the assets and personal property of Inman Chevrolet Company as a going concern, as it is fully and forcefully described in the evidence which we quoted above and is reflected in the various auditors' reports in evidence. These points directed at Special Issue No. 53 are overruled.

By their points 88 and 134, the appellants present their objection to the court's charge as a whole, on the ground that nowhere in the charge did the court submit to the jury whether a partnership existed prior to December 26, 1951, the existence of such partnership was the basic theory upon which appellee Ruth Parr built her suit. We find no error presented by these points and they are overruled.

The partnership agreement signed by all the parties December 26, 1951 recite that the business had been conducted since the end of the administration of the estate of Philip Inman, deceased, as an informal partnership without a written agreement and the appellant M. G. Inman, Sr. testified that the business had been conducted during that time as a partnership. While it is the general rule that a married woman cannot form a partnership, it is apparent here that the parties found themselves in a partnership in a going business, operated it as such and the profits as a partnership were divided from the business. As to the status of M. G. Inman, Sr., in regard to his two sisters, one of whom was a married woman at the time, the surrounding facts and circumstances of the beginning of such operation as a partnership on January 1, 1951 and its continuation through the negotiations which brought about the signing of the instruments in question, and eventually resulted in this lawsuit, were such that the parties had all the duties and responsibilities to each other of partners. The trial court was justified in assuming as a matter of law that such a partnership was in existence, and that it was unnecessary to submit an issue to the jury as to that fact.

By their Points Nos. 105 through 133, inclusive, the appellants complain of the action of the trial court in overruling their motion to disregard the findings of the jury to various special issues, and also complain of the trial court's action in overruling their objections to Special Issues Nos. 3, 8, 9, 16, 17, 18, 21, 25, 26, 33, 34, 35, 52 and 53, by which objections they urged that there was no evidence to support affirmative answers to said issues. Under these points they present again the basic contention in the case that the evidence shows no fraud, and no reliance by the appellees upon any representation made by appellant M. G. Inman, Sr. We have considered this contention above in passing upon the points dealing with motions for instructed verdict, and held that there was sufficient evidence in the record. We overrule all of these points under consideration here and hold that all the answers of the jury to the various special issues submitted were supported by sufficient evidence.

By their points Nos. 89 to 93, inclusive, the appellants complain of the trial court's ruling with reference to testimony of the witness Carl Bernhardt bearing upon the lack of market value and his opinion regarding the intrinsic value of Inman Chevrolet Company. Mr. Bernhardt testified that he is a certified public accountant, business analyst "and related things which go with being a certified public accountant"; that he received a BBA degree from the University of Texas in 1938; that he attended the East Texas College of Law and also attended Harvard University Graduate School, having attained enough hours of study for his Master's degree but has never written his thesis; he had practiced his profession in Port Arthur since his graduation and is licensed by the State Board of Public Accountants. He described the nature of the practice of his profession and testified that he had in the past handled the dealer accounts of various major automobile manufacturers.

He testified over objection that a new car franchise dealership in Port Arthur in 1951 had no cash market value, because of the limitations on the sale of such businesses placed in the franchise or sales contracts by the automobile manufacturers. Appellants' objection to such question and answer was that there was no showing that the witness was ever engaged in the automobile business or knew whether it does or does not have a cash market value, and there was no showing that the witness was familiar with the terms and conditions of that particular Chevrolet dealership.

The witness then testified that he had examined the financial reports and audits of the Inman Chevrolet Company and in his opinion that business as a Chevrolet dealer had a real or intrinsic value about December 26, 1951, and that such value amounted to $1,588,995.06. He related the professionally scientific methods used by him in

arriving at his conclusions on which he based his opinion as an expert. In the question which was answered by the witness, the term "real or intrinsic value" was defined as "the true inherent and essential value, independent of accident, place or person, which value is the same everywhere and to everyone." Appellants objected to the question and answer on the ground that the definition of the term, "intrinsic value" was incorrect; that the question as framed calls upon the witness to construe legal terms in connection with his opinion and that it had not been shown that the witness was acquainted with the franchise under which Inman Chevrolet Company was being operated at the time. At the close of Mr. Bernhardt's testimony the appellants moved the court to strike it from the record, for the reason that it has not been established that the business did not have a reasonable cash market value in the vicinity of Port Arthur, Texas, and further for the reason that in view of the explanations as to how he arrived at that value, they are contrary to the rules of law prescribed for determining the intrinsic value of property in the event there is no cash market value. The court overruled the motion to strike. The testimony of the witness was lengthy, running from page 276 throught 305 of the statement of facts. We will not set it out because this opinion is already too long, and it would serve no good purpose to copy parts of it here. We overrule the points of appellants in regard to this witness and his evidence. He qualified as an expert in the matters about which he was questioned. The lengthy and detailed method by which he arrived at his expert opinion was admissible, as was the conclusion and opinion. He gave at length the elements which he took into consideration in arriving at the intrinsic value of the business, stating that in arriving at such real or intrinsic value he considered the physical, tangible assets of the business, its past 5-year record of profits and the intangible good will or going concern value of the business, and determined in a method which he presented what cash investment would be required to produce such regular and continued profits.

■ The points and arguments presented thereunder again present one of the appellants' basic contentions, that is, that good will and other such intangible assets of the Inman Chevrolet Company could not and did not enter into the value of the interests sold and agreed to be sold by the appellees to the appellants, since M. G. Inman, Sr. fully intended to cancel the Chevrolet franchise and put an end to the business unless his sisters agreed to his proposition. As we have indicated above in this opinion, we believe that from the limitations in the franchise or sales contract on any change of ownership of the Inman Chevrolet Company, the business did not have a cash market value. The witness' testimony to that effect was proper and supported by his training, experience and knowledge of the limitations placed in all such contracts by General Motors Corporation and its various divisions.

■ We think, also, that it was not improper for the witness to consider, in arriving at his expert opinion, the value of the business as a going concern and its good will value as an asset. See: Texas & P. Railway Co. v. Mercer, 127 Tex. 220, 90 S.W.2d 557, 106 A.L.R. 1299; Scott v. Doggett, Tex.Civ.App., 226 S.W.2d 183.

We agree with the appellees that the trial judge did not abuse his discretion in admitting the testimony of this witness and overruling the motion to strike. The points are overruled.

Under points 94 and 95 the appellants present their contention that there is no evidence on which the jury could answer Special Issue No. 53, inquiring what amount of money would compensate appellee Ruth Parr for loss suffered by executing the instruments under consideration, and appellants also complain that the sum of $100,000, the finding by the jury, is grossly excessive and not supported by the evidence. Under these points the appellants

present no argument nor authorities, and point out that they have been discussed under previous points. We likewise believe that they have been presented elsewhere in their brief, and discussed elsewhere in this opinion, and we accordingly overrule these points without discussion.

■ Point Nos. 97 and 98 present the appellants' complaint of the trial court's action in permitting both appellees to testify that M. G. Inman, Sr. represented to them that he would not exercise the written options to purchase, unless Chevrolet Motors Division compelled him to do so, their objection being that such testimony was in violation of the parol evidence rule. These points present no error. The testimony complained of was properly admitted in an effort to prove that fraud entered into the execution of the contract, and is not an attempt to vary or alter the contract which was actually made. Such a representation, which the jury has found was made and which it also has found to be false, was admissible in determining whether the performance should be granted on the cross action of the appellants. In Ewing Company v. Kruger, Tex.Civ.App., 152 S.W.2d 488, 491, specific performance of a contract was denied where it was shown that the defendant had been induced to sign a contract upon a representation of an agent of plaintiff that the instrument would not be used against him, but that the agent wanted the writing merely to show his Board of Directors that he was "on the job".

■ Under points Nos. 96, 99, 100, 101 and 104, appellants complain for various reasons of the trial court's entering the judgment which was entered. These points present again the appellants' contention that appellee Grace Booth was a married woman and, therefore, could not enter into a partnership agreement; that there was no evidence that any partnership existed before the agreement signed December 26, 1951, and no finding by the jury that a partnership existed. They also complain because the judgment did not credit them with the profits withdrawn by Ruth Parr in the years 1951 and 1952, and say that the court should not enter judgment for Ruth Parr for damages on her election of remedies, because she was thus permitted to speculate on the business operation of Inman Chevrolet Company and speculate upon the verdict of the jury. We overrule these points with a very brief discussion. We have already held above that there was an informal partnership in existence during 1951 until the written agreements were signed. It seems to be well settled that a party to a contract may sue for rescission of a contract and in the alternative for damages for fraud in inducing the contract. Grabenheimer v. Blum, 63 Tex. 369.

The judgment rendered for Ruth Parr was proper under the findings of the jury and other undisputed evidence before the trial court.

■ The judgment in favor of Grace Booth, denying the appellants specific performance was proper under the jury's findings and undisputed evidence before the court. The remedy of specific performance is an equitable remedy, and there is no definite rule by which the action of the court can be determined in all cases. The granting or withholding the relief depends upon consideration of all circumstances in the case. In order to be entitled to specific performance one seeking such remedy must come into court with clean hands and the contract must be equitable, perfectly fair in all its terms and free from any misrepresentations, fraud, mistake or misapprehension. See 38 Tex.Jur., p. 423, et seq., and cases cited therein.

The appellee Grace Booth is in a position in this suit from which she would be entitled to a judgment denying specific performance to appellants on their cross action, even though the evidence would not be sufficient to support a decree of cancellation and rescission. See 38 Tex.Jur. p. 424; Tanner v. Imle, Tex.Civ.App., 253 S.W. 665; Riggins v. Trickey, 46 Tex.Civ.App. 569, 102 S.W. 918.

We find no error requiring a reversal of the judgment and it is accordingly affirmed.